1
2
3
4
5      **UNITED STATES DISTRICT COURT**
6      **SOUTHERN DISTRICT OF CALIFORNIA**
7

8   IN RE: COUNTRYWIDE FINANCIAL            CASE NO. 08md1988 DMS (LSP)
    CORP. MORTGAGE MARKETING AND           CASE NO. 08cv1888 DMS (LSP)
9   SALES PRACTICES LITIGATION             CASE NO. 08cv1957 DMS (LSP)
                                           CASE NO. 08cv1972 DMS (LSP)
10  ————————————————————————————

    SYMONE LEYVAS, *et al.*,                **ORDER GRANTING IN PART**
11                                          **AND DENYING IN PART**
                        Plaintiffs,         **DEFENDANTS' MOTION TO**
12  v.                                      **DISMISS**

13                                          [Docket Nos. 50 (08md1988), 38
                                            (08cv1888), 25 (08cv1957), and 69
14  BANK OF AMERICA CORP., *et al.*         (08cv1972)]

15                      Defendants.
16  ————————————————————————————

17  KIMBERLY A. JACKSON, on behalf of
    herself and all others similarly situated,
18
                        Plaintiffs,
19  v.

20  COUNTRYWIDE FINANCIAL CORP., *et
    al.*,
21
                        Defendants.
22  ————————————————————————————

23  HEATH O. WHITE, on behalf of himself and
    all others similarly situated,
24
                        Plaintiffs,
25  v.

26  COUNTRYWIDE FINANCIAL CORP., *et
    al.*,
27
                        Defendants.
28

- 1 -

1        This matter comes before the Court on Defendants' motion to dismiss the Consolidated Class

2   Action Complaint ("CAC").  The motion came on for hearing on January 30, 2009. Joe R. Whatley,

3   Jr. and Donna Siegel Moffa appeared and argued on behalf of Plaintiffs and Thomas M. Hefferon

4   appeared and argued on behalf of Defendants.  After thoroughly reviewing the parties' briefs and the

5   record on file herein, and after hearing oral argument, the Court grants the motion in part and denies

6   the motion in part.

7   **I.**

8   **BACKGROUND**

9        This case is part of a multi-district litigation involving states, individuals and several business

10  entities involved in mortgage lending across the country.  Plaintiffs filed separate class action

11  complaints in other courts, and those complaints were transferred to this Court pursuant to an order

12  from the Judicial Panel on Multidistrict Litigation.  After transfer, the named  Plaintiffs filed a

13  Consolidated Class Action Complaint ("CAC"), which is the subject of the present motion to dismiss.

14  The named Plaintiffs in this class action case are Francis G. and Rebecca G. Sizemore, Edward

15  Marini, Kimberly and Philip D. Menichetti, Sequesta Washington, Symone and John Leyvas, June

16  Harding Brown, Preston Givens and Paula Prezola, and Kimberly A. Jackson.  Defendants are

17  Countrywide Financial Corp. ("CFC"), Countrywide Bank, FSB ("CW Bank, FSB"), Countrywide

18  Home Loans, Inc. ("CHL"), Countrywide KB Home Loans, LLC, Countrywide Tax Services Corp.

19  ("CT"), LandSafe, Inc., LandSafe Appraisal Services, Inc., LandSafe Credits, Inc., LandSafe Flood

20  Determination, Inc., and Bank of America Corp. ("BAC").

21       In general, Plaintiffs allege Defendants have engaged in a scheme to steer borrowers into

22  subprime mortgages, which were then sold as investments in the secondary mortgage market.  (CAC

23  at 1-2.) Plaintiffs allege Defendants pushed borrowers into subprime loans irrespective of their ability

24  to repay the loans or their suitability for other types of loans.  (*Id.*)  According to Plaintiffs,

25  Defendants executed this scheme through fraudulent means, including:

26           •     incentivizing employees and brokers to place borrowers into subprime loans, (*id.* at 2-3),

27

28           •     training and instructing employees to place borrowers into subprime loans without explaining the terms or disclosing the risks, (*id.*),

- "making false representations to borrowers, as set forth in standardized sales scripts, that they were offering the best loans available to the borrowers." (*id.* at 4),

- using "an automated, computerized underwriting program that was designed to maximize the number of subprime loans[,]" (*id.* at 6),

- failing to adequately disclose future interest rate increases, (*id.* at 7),

- failing to disclose the risk of negative amortization, (*id.*),

- misrepresenting the borrowers' ability to refinance, (*id.* at 11-12), and

- failing to disclose the overall scheme.

The allegations as to specific Plaintiffs are as follows:

The Sizemores

"On May 19, 2006, the Sizemores received a subprime loan in the form a 'pay option' adjustable rate mortgage from Countrywide Home Loans, Inc., in order to refinance the mortgage on their primary residence" in South Carolina. (*Id.* at 14.)

> Under Countrywide's pay option ARM loan, a borrower is given three different payment options to choose from each month. The top-tier option, 'amortized payment' encompasses payments of interest and a portion of the principal of the loan. The middle option is the 'interest only payment,' which covers only the interest for the month and does not decrease the principal amount of the loan. The third, and lowest, payment option is what Countrywide calls the 'minimum payment.' When a borrower makes the 'minimum payment' on a pay option ARM loan, he or she is in fact paying *less* that the interest owed on the principal loan, and the unpaid interest is added to the principal amount owed. Once the principal amount reaches 115% of the original loan amount, the repayment structure resets to significantly higher monthly payments.

(*Id.* at 3.)  Plaintiffs allege that "at the time of the loan," Countrywide failed to disclose to the Sizemores the effect of making only the "minimum payments," that their monthly payments would soon increase, and that they would be charged a prepayment penalty if they refinanced within three years.  (*Id.* at 14.)  On the contrary, Plaintiffs allege that the Countrywide Loan Officer, Cortney Lanktree, told the Sizemores their monthly payment would remain constant for three years, they would not suffer negative amortization if they paid the "monthly minimum," their loan was spread out over forty years, and there would not be a prepayment penalty if they refinanced within the first three years. (*Id.*)  Plaintiffs allege the Sizemores requested that the information they received about the prepayment penalty be put in writing, which Ms. Lanktree did in a letter dated April 25, 2006.  (*Id.* at 15.)

1  / / /

2      On June 5, 2007, Countrywide sent a letter to the Sizemores alerting them that the required

3  monthly payment on their mortgage would soon increase significantly based on the negative

4  amortization of their loan.  (*Id.*)  The following month, the Sizemores sought to refinance their loan,

5  but they were told that Countrywide would not honor Ms. Lanktree's letter.  (*Id.*)  Plaintiffs allege the

6  Sizemores would not have refinanced with Countrywide had they been informed "that their principal

7  would increase as a result of making the 'minimum payment' on their loan[.]"  (*Id.* at 16.)

8      <u>Edward Marini</u>

9      Edward Marini is a disabled Vietnam veteran on a fixed income.  (*Id.*)  Plaintiffs allege he was

10  solicited by Countrywide via telephone to refinance his Countrywide home loan in the first part of

11  2005.  (*Id.*)  Plaintiffs allege a Countrywide customer service representative told Marini that the

12  interest rate on his loan would be fixed for five years "with an increase of one hundred dollars ($100)

13  per month[.]"  (*Id.*)  Plaintiffs further allege "Countrywide representatives continuously reiterated"

14  this representation to Marini.  (*Id.*)

15      Marini thereafter refinanced his mortgage with a pay option ARM loan.  (*Id.* at 17.)  "[A]t the

16  time of the loan," Countrywide did not disclose to Marini that his monthly payments would soon

17  increase, nor did they disclose that negative amortization would occur if he made only the "minimum

18  payment."  (*Id.*)

19      As with the Sizemores, on August 6, 2007, Countrywide sent a letter to Marini alerting him

20  that the minimum payment on his loan would soon be more than double his current payment based

21  on the negative amortization of his loan.  (*Id.*)  Plaintiffs allege Marini would not have entered into

22  the loan with Countrywide had he been informed that the "minimum payments" would result in

23  increased principal.  (*Id.*)  Plaintiffs allege Marini will need to file for bankruptcy, (*id.*), and indeed,

24  he did so before the CAC was filed.  (*See* Defs.' Request for Judicial Notice in Supp. of Mot., Ex. D.)

25

26      <u>The Menichettis</u>

27      The Menichettis obtained a pay option ARM loan from Countrywide Bank, N.A. ("CW Bank,

28  N.A. on August 18, 2006.  (CAC at 18.)  The Menichettis obtained the loan through Don Cutler, a

- 4 -

broker at Mid Atlantic Capital ("Mid Atlantic"). (*Id.*)  Mr. Cutler first contacted the Menichettis by letter about refinancing their mortgage.  (*Id.*)  Plaintiffs allege that neither Countrywide nor Mid Atlantic disclosed to the Menichettis that their monthly payments would increase soon after taking the loan or that their principal would increase if they made the "minimum payment" each month.  (*Id.*)  On the contrary, Plaintiffs allege Mr. Cutler told the Menichettis he was providing a "good mortgage option," they would now have a "low monthly payment," and it was "the best loan he could think of." (*Id.*)

After obtaining the loan, the Menichettis noticed that the principal balance began increasing. (*Id.* at 18-19.)  They sought assistance from Countrywide, but have yet to receive any.  (*Id.* at 19.) Plaintiffs allege the Menichettis would not have entered into the loan with Countrywide had they known that paying the "minimum payment" would result in an increase in their principal balance. (*Id.*)

Sequesta Washington

Washington obtained a subprime loan from Full Spectrum Lending, Inc., a former subsidiary of CFC, on November 20, 2004.  (*Id.* at 20.)  Plaintiffs allege that "at the time of the loan," Countrywide failed to disclose to Washington that her interest rate would only be fixed for three years. (*Id.*)  Plaintiffs also allege that Washington spoke to a Countrywide loan officer, Fred Aghili, about her ability to make the monthly payments, but Mr. Aghili told Washington she could refinance at any time.  (*Id.*)

Washington began experiencing difficulty in making her monthly payments.  (*Id.*)  She tried to refinance on two separate occasions, but was told that she could not for different reasons.  (*Id.*) Plaintiffs allege Washington would not have entered into the loan had she known that her interest rate would adjust in three years, or that she could not refinance at any time.  (*Id.*)

The Leyvases

In July 2007, the Leyvases began looking to refinance their then-existing mortgage to reduce their debts, lower their interest rate, and obtain up to $15,000 cash.  (*Id.* at 21.)  They worked with a broker at Equity Capital Group, Inc., who promised the Leyvases that Countrywide would provide them with a 30-year fixed-rate loan with an interest rate between 7.0% and 8.5%.  (*Id.*)

1    The Leyvases obtained a home loan from Countrywide "on or about August 31, 2007." (*Id.*

2  at 21.)  At closing, the Leyvases were surprised to learn that the amount of cash they were promised

3  had been reduced from nearly $13,959 to $1,294.  (*Id.*)  They were also presented with conflicting

4  amortization schedules, one for a thirty-year term at 9.8% interest, and the other a forty year term at

5  10.25% interest.  (*Id.* at 22.)  They also learned that their loan was a hybrid ARM loan with a 40-year

6  term.  (*Id.*)

7    June Harding Brown

8    June Harding Brown is a senior citizen who resides in Philadelphia, PA.  (*Id.* at 23.)  "[O]n or

9  about August 17, 2007," she obtained a home loan from Countrywide.  (*Id.*)  "At the time of her loan,

10  Plaintiff Brown had a good credit score, but was on a fixed income.  Accordingly, she was seeking

11  to lower her monthly expenses." (*Id.*)  Brown dealt with a third party broker at Capital Icon, Inc., who

12  promised to save her money.  (*Id.*)  The broker specifically told Brown that Countrywide had a

13  "special program" that would be helpful to her.  (*Id.*)  When Brown questioned the broker about a

14  possible increase in her payment, the broker "told her 'not to worry about it' and that she should focus

15  only upon the minimum monthly payment." (*Id.*)

16    After she obtained the loan, Brown discovered that her outstanding balance was increasing.

17  (*Id.*)  She called Countrywide to complain, and was told that she would need to increase the amount

18  of her monthly payments to avoid negative amortization.  (*Id.* at 23-24.)  Plaintiffs allege that no one

19  disclosed to Brown that negative amortization would occur if she made only the "minimum payment."

20   (*Id.* at 24.)  They further allege the "minimum payment" was used to lure Brown into the loan.  (Id.)

21  Plaintiffs also allege the interest rate on Brown's loan was 9.75%, higher than the rate on her previous

22  loan.  (*Id.*)  Countrywide eventually offered to modify Brown's loan in return for a modification fee.

23  (*Id.*)

24    Preston Givens and Paula Prezola

25    Givens and Prezola, husband and wife, were seeking to purchase a home from KB Home.  (*Id.*)

26  An on-site representative of KB Home, Alexander Bejenaru, referred Givens and Prezola to

27  Countrywide KB Home Loans, who provided Givens and Prezola with a loan on or about September

28  28, 2007.  (*Id.*)

1   Givens and Prezola had telephonic contact with Countrywide KB Home Loans, despite their

2   repeated requests for a personal meeting. (*Id.* at 25.)  Countrywide KB Home Loans told Givens and

3   Prezola that their deposit, together with incentives from KB Home, would cover all closing costs as

4   well as their down payment. (*Id.*)  Givens and Prezola were also provided with a good faith estimate

5   that indicated a rate of 9.625% on a 30-year loan with zero points. (*Id.*)

6   At closing, however, Countrywide KB Home Loans demanded an additional $13,000 in cash.

7   (*Id.*)  Further, despite the representations alleged above, Givens and Prezola received a 5-year hybrid

8   ARM loan with an initial interest rate of 11.250% on a 40-year loan term. (*Id.*)  Givens and Prezola

9   were also provided with conflicting documents at closing concerning the amount financed. (*Id.*)

10   <u>Kimberly A. Jackson</u>

11   Plaintiffs allege that Countrywide employees monitored Jackson's credit report after she

12   received a loan from Countrywide Home Loans, Inc. on January 9, 2004. (*Id.* at 26.)  When

13   employees discovered an outstanding medical bill, they targeted Jackson as a candidate for

14   refinancing. (*Id.*)  Plaintiffs allege that Jackson refinanced with a subprime loan from Countrywide

15   on September 28, 2005, "in response to frequent calls and false, misleading and/or otherwise deceptive

16   representations from Countrywide encouraging her to refinance her mortgage and receive cash to pay

17   off her bills[.]" (*Id.*)  Plaintiffs allege that Jackson's principal increased by $11,000, of which she

18   received only $6,000, and the interest rate she received was not what she was promised. (*Id.*)

19   Plaintiffs further allege that Jackson would not have refinanced her loan had she known that her

20   principal and interest rate would increase. (*Id.*)

21   These allegations serve as the factual basis for Plaintiffs' legal claims, which allege:  (1) a

22   violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c),

23   (2) conspiracy to violate RICO, 18 U.S.C. § 1962(d), (3) aiding and abetting a violation of RICO, 18

24   U.S.C. § 2, (4) violation of California Business and Professions Code § 17200, (5) violation of

25   California Business and Professions Code § 17500, and (6) unjust enrichment.

26   **II.**

27   **DISCUSSION**

28

1        Defendants raise a host of arguments in support of their motion to dismiss the CAC.  First, they

2   argue Defendants BAC, CFC and the Landsafe Defendants should be dismissed from this case because

3   they did not make any of the loans to Plaintiffs.  Second, Defendants assert Plaintiffs' RICO claims

4   must be dismissed.  Defendants contend these claims (a) do not satisfy the pleading requirements of

5   Federal Rule of Civil Procedure 9(b), (b) they are based on non-actionable "puffery," (c) they do not

6   set forth the necessary connection to Plaintiffs, and (d) the alleged non-disclosures are not actionable

7   because they either (i) were, in fact, disclosed, (ii) Defendants had no duty to disclose, and (iii)

8   Plaintiffs have not alleged that they relied on the non-disclosures or that their reliance was reasonable.

9   Defendants also contend Plaintiffs allegations of a RICO enterprise are legally invalid, the conspiracy

10  claim falls with the substantive RICO claim, and there is no private right of action for aiding and

11  abetting a violation of RICO.  Third, Defendants argue the § 17200 and 17500 claims must be

12  dismissed because they, too, fail to satisfy the pleading requirement of Rule 9(b), Defendants cannot

13  be liable for statements by third parties, and the alleged non-disclosures were actually disclosed.

14  Fourth, Defendants assert Plaintiffs' claim for unjust enrichment is legally invalid.  Defendants raise

15  additional arguments as to specific Plaintiffs and their respective claims.

16  **A.      Standard of Review**

17       Dismissal pursuant to Rule 12(b)(6) is proper only where there is no cognizable legal theory

18  or an absence of sufficient facts alleged to support a cognizable legal theory.  *Navarro v. Block*, 250

19  F.3d 729, 732 (9th Cir. 2001) (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

20  1988)).  In deciding a 12(b)(6) motion, all material factual allegations of the complaint are accepted

21  as true, as well as all reasonable inferences to be drawn from them.  *Cahill v. Liberty Mut. Ins. Co.*,

22  80 F.3d 336, 338 (9th Cir. 1996).  However, the court need not accept all conclusory allegations as

23  true; rather, it must "examine whether conclusory allegations follow from the description of facts as

24  alleged by the plaintiff." *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992) (citation omitted).

25  *See also Benson v. Arizona State Bd. of Dental Examiners*, 673 F.2d 272, 275-76 (9th Cir. 1982)

26  (court need not accept conclusory legal assertions); *Sherman v. Yakahi*, 549 F.2d 1287, 1290 (9th Cir.

27  1977) ("Conclusory allegations, unsupported by facts, [will be] rejected as insufficient to state a claim

28  under the Civil Rights Act."); *accord Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984) ("All

1   well-pleaded facts, as distinguished from conclusory allegations, must be taken as true."). A claim

2   "'should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in

3   support of his claim which would entitle him to relief.'" *Perfect 10, Inc. v. Visa Intern. Service Ass'n*,

4   / / /

5   494 F.3d 788, 794 (9th Cir. 2007), *cert. denied*, ___ U.S. ___, 128 S.Ct. 2871 (2008), (quoting

6   *Rodriguez v. Panayiotou*, 314 F.3d 979, 983 (9th Cir. 2002)).

7   **B.      RICO Claims**

8          Plaintiffs allege three RICO claims: (1) a substantive claim under § 1962(c), (2) a conspiracy

9   claim under § 1962(d), and (3) a claim for aiding and abetting under 18 U.S.C. § 2. Defendants argue

10  the substantive claim must be dismissed, and dismissal of that claim warrants dismissal of the

11  conspiracy claim. They also assert the aiding and abetting claim is not legally valid. Plaintiffs dispute

12  these arguments.

13         1.      Section 1962(c)

14  Section 1962(c) states:

15         It shall be unlawful for any person employed by or associated with any enterprise
        engaged in, or the activities of which affect, interstate or foreign commerce, to conduct
16      or participate, directly or indirectly, in the conduct of such enterprise's affairs through
        a pattern of racketeering activity or collection of unlawful debt.

17

18  18 U.S.C. § 1962(c). To state a claim under this statute, "a plaintiff must allege '(1) conduct (2) of

19  an enterprise (3) through a pattern (4) of racketeering activity.'" *Odom v. Microsoft Corp.*, 486 F.3d

20  541, 547 (9th Cir.) (*en banc*), *cert. denied*, ___ U.S. ___, 128 S.Ct. 464 (2007), (quoting *Sedima,

21  S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). In this case, Defendants challenge the second and

22  fourth elements.

23         *a.      Enterprise*

24         RICO defines an enterprise to include "any individual, partnership, corporation, association,

25  or other legal entity, and any union or group of individuals associated in fact although not a legal

26  entity[.]" 18 U.S.C. § 1961(4). In this case, Plaintiffs allege two different RICO enterprises: (1) The

27  Countrywide Broker Enterprise, and (2) the Countrywide Enterprise.

28         *i.      The Broker Enterprise*

- 9 -

Plaintiffs allege:

> the following persons constitute a group of individuals associated in fact that will be referred to herein as the 'Countrywide Broker Enterprise': (1) Countrywide, including its LandSafe loan closing services subsidiaries, and (2) Mid Atlantic Capital, One Source Mortgage, and other mortgage brokers not named as defendants herein who have contracts with Countrywide pursuant to which they sell, arrange, promote, or otherwise assist Countrywide in directing borrowers into loans issued by Countrywide.

(CAC at 51.)  Defendants argue this enterprise is legally invalid because Plaintiffs fail to plead the requisite connections between the independent mortgage brokers, and Plaintiffs allegations are "too vague and overbroad."

There are three criteria for establishing an associated-in-fact enterprise under RICO: (1) "'a common purpose of engaging in a course of conduct[,]'" (2) "'an ongoing organization, formal or informal,'" and (3) "'evidence that the various associates function as a continuing unit.'"  *Odom*, 486 F.3d at 552 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  Here, Defendants argue that Plaintiffs have failed to allege any connections between the independent mortgage brokers, thereby defeating the "common purpose" requirement.[1]  Defendants contend the allegations in the CAC describe a "hub and spoke" structure, which does not fall within the definition of a RICO enterprise. However, Defendants fail to cite any binding authority to support this argument.  (*See* Mem. of P. & A. in Supp. of Mot. at 24-25) (citing primarily cases from Southern District of New York and other district courts outside the Ninth Circuit).  Indeed, Ninth Circuit law is to the contrary. *See Odom*, 486 F.3d at 551 ("an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise.")  Accordingly, the Court rejects this argument.

The Court also rejects Defendants' argument that Plaintiffs' allegations about the Broker Enterprise are "too vague and overbroad."  Unlike the cases cited by Defendants, Plaintiffs here have identified the individuals that make up the enterprise.  They include:

---

[1]  At oral argument, Defendants' counsel asserted that Defendants were challenging the third element of the test, namely that the alleged enterprise functions as a "continuing unit."  The Court notes this particular argument was not raised in Defendants' briefs, therefore it may be deemed waived.  *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) (stating arguments not raised in opening brief are deemed waived).  To the extent the arguments raised are simply directed at this element, however, the Court rejects them for the reasons set out below.

1
2
3
    (1) Countrywide, including its LandSafe loan closing services subsidiaries, and (2) Mid Atlantic Capital, One Source Mortgage, and other mortgage brokers not named as defendants herein who have contracts with Countrywide pursuant to which they sell, arrange, promote, or otherwise assist Countrywide in directing borrowers into loans issued by Countrywide.

4   (CAC at 51.)  This is more specific than simply identifying "unnamed car dealers," *see Richmond v.*

5   *Nationwide Cassel, L.P.*, 52 F.3d 640, 645 (7th Cir. 1995), or "secondary lenders."  *See VanDenBroeck*

6   / / /

7   *v. CommonPoint Mortg. Co.*, 210 F.3d 696, 700 (6th Cir. 2000).[2]  Thus,  Plaintiffs' allegations about

8   the Broker Enterprise are sufficient.

9                   *ii.*    *The Countrywide Enterprise*

10      In addition to alleging the existence of the Broker Enterprise, Plaintiffs allege the existence

11  of an alternative Countrywide Enterprise.  They allege, based on their current knowledge, "the

12  following persons constitute a group of individuals associated in fact that will be referred to herein

13  as the 'Countrywide Enterprise': (1) Countrywide and (2) Countrywide's subsidiaries, including its

14  LandSafe loan closing services subsidiaries."  (CAC at 52.)  Defendants assert these allegations are

15  insufficient because a parent corporation and its subsidiaries cannot legally constitute a RICO

16  enterprise.  Plaintiffs disagree.

17      Relying on the text of § 1962(c), courts have consistently held that "the 'person' must be a

18  separate and distinct entity from the 'enterprise.'"  *Schreiber Distributing Co. v. Serv-Well Furniture*

19  *Co., Inc.*, 806 F.2d 1393, 1396 (9th Cir. 1986).  Although the Ninth Circuit has not decided whether

20  a parent and its subsidiary satisfies this distinctiveness requirement, other circuits have decided that

21  these entities generally are not sufficiently distinct.  *See Bucklew v. Hawkins, Ash, Baptie & Co., LLP*,

22  329 F.3d 923, 934 (7th Cir. 2003); *Bessette v. Avco Financial Services, Inc.*, 230 F.3d 439, 449 (1st Cir.

23  2000); *Fogie v. THORN Americas, Inc.*, 190 F.3d 889, 898 (8th Cir. 1999); *Lorenz v. CSX Corp.*, 1

24  F.3d 1406, 1412 (3d Cir. 1993).  These courts recognize that the parent and its subsidiary are separate

25

26
27
28
    [2] The other cases cited by Defendants are distinguishable for another, more important reason: Rather than focusing on the specificity or breadth of the plaintiffs' allegations, those cases relied on the plaintiffs' failure to allege a structure within the alleged enterprise.  *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000) (stating RICO claim failed "because the enterprise lacks the requisite structure"); *Nordberg v. Trilegiant Corp.*, 445 F.Supp.2d 1082, 1091 (N.D. Cal. 2006) (finding plaintiffs "failed to identify any sort of independent structure").  In light of *Odom*, that reasoning does not apply here.

1    legal entities.  However, they also acknowledge that "a subsidiary that simply conducts its affairs as

2    delegated by the parent company for the profit of the parent company is engaged in nothing more than

3    a legitimate corporate and financial relationship, which is certainly not subject to RICO liability on

4    that basis alone."  *Bessette*, 230 F.3d at 449 (citations omitted).  Accordingly, these courts require

5    "something more" to satisfy the distinctiveness requirement.  *See Bucklew*, 329 F.3d at 934 (citations

6    omitted) (stating plaintiffs must show that the "decision to operate through subsidiaries rather than

7    divisions somehow facilitated [the enterprise's] unlawful activity"); *Bessette*, 230 F.3d at 449 (quoting

8    *Brannon v. Boatmen's First National Bank of Oklahoma*, 153 F.3d 1144, 1148 (10th Cir. 1998))

9    (same); *Fogie*, 190 F.3d at 898 (stating "there must be a greater showing that the parent and subsidiary

10   are distinct than the mere fact that they are separate legal entities.").

11           Without conceding that this is the proper test for distinctiveness,[3] Plaintiffs assert their

12   allegations satisfy this test.  They specifically rely on their allegations that:

13           the participation by the LandSafe subsidiaries in the Countrywide Enterprise allows
             the enterprise to function more effectively, given that many of the functions provided
14           by these entities, such as appraisals, would normally be conducted by independent
             entities.  LandSafe's participation in the enterprise allows the normal checks and
15           balances within the mortgage process to be eliminated, permitting Defendants to
             advance their scheme and conceal the fraudulent activity they have been engaging in.
16

17   (CAC at 53.)  Defendants do not address these specific allegations.  Instead, they reiterate their

18   position that Plaintiffs have not satisfied the distinctiveness requirement.

19           These allegations, however, satisfy the "something more" test.  Consistent with the Seventh

20   and First Circuits, Plaintiffs allege that the decision to operate through the LandSafe Defendants

21   facilitated the activity of the enterprise by removing a potential for "checks and balances" from the

22   loan process.  *See Z-Tel Communications, Inc. v. SBC Communications, Inc.*, 331 F.Supp.2d 513, 561

23   (E.D. Tex. 2004) (finding allegations that subsidiaries' actions concealed, masked and facilitated

24   scheme satisfied *Bucklew*'s exception).  Plaintiffs also allege that each individual in the Countrywide

25

26           [3] Plaintiffs urge the Court to adopt the reasoning of *Cedric Kushner Promotions, Ltd. v. King*,
27   533 U.S. 158 (2001), and *Sever v. Alaska Pulp Co.*, 978 F.2d 1529 (9th Cir. 1992), in deciding whether
     they have satisfied the distinctiveness requirement.  However, neither of those cases addressed
28   whether a parent and its subsidiary are sufficiently distinct under RICO.  Rather than adopting the
     reasoning from a different set of circumstances, the Court finds it more appropriate to consider the
     reasoning of those courts that have addressed this particular issue.

1  Enterprise had a distinct role.  For instance, CHL was in the business of originating loans, CT

2  provided tax services in connection with the loans, LandSafe Inc. provided a variety of products

3  during the closing process, LandSafe Appraisal Services, Inc. provided appraisal services, *etc.  See*

4  *Lorenz*, 1 F.3d at 1412 ("the plaintiff must plead facts which, if assumed to be true, would clearly

5  show that the parent corporation played a role in the racketeering activity which is distinct from the

6  activities of its

7  / / /

8  subsidiary.")  These allegations satisfy the distinctiveness requirement, and are sufficient to withstand

9  Defendants' motion to dismiss.

10                          *b.     Racketeering Activity*

11         The other disputed element of Plaintiffs' RICO claim is racketeering activity.  The racketeering

12  activity at issue in this case is mail and wire fraud, including affirmative misrepresentations and non-

13  disclosures.  Defendants assert that the individual affirmative misrepresentations fail to satisfy Rule

14  9(b), and that the general alleged misrepresentations are non-actionable puffery.  They also contend

15  the non-disclosures are not actionable, either because the information was actually disclosed in loan

16  documents or Defendants owed no duty of disclosure.  Plaintiffs dispute each of these arguments.

17                          *i.     Individual Misrepresentations*

18         Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or mistake, a party must state

19  with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This Rule:

20         serves to give defendants adequate notice to allow them to defend against the charge
           and to deter the filing of complaints "as a pretext for the discovery of unknown
21         wrongs," to protect professionals from the harm that comes from being subject to fraud
           charges, and to "prohibit [ ] plaintiff[s] from unilaterally imposing upon the court, the
22         parties and society enormous social and economic costs absent some factual basis."

23  *In re Stac Electronics Securities Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (quoting *Semegen v.*

24  *Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)).  Rule 9(b) "applies to civil RICO fraud claims."  *Edwards*

25  *v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004) (citing *Alan Neuman Prods., Inc. v.*

26  *Albright*, 862 F.2d 1388, 1392 (9th Cir. 1989)).  To satisfy Rule 9(b) in this context, the plaintiff must

27  "'state the time, place, and specific content of the false representations as well as the identities of the

28

1  parties to the misrepresentation.'" *Id.* at 1066 (quoting *Alan Neuman*, 862 F.2d at 1393).  Defendants

2  argue Plaintiffs have failed to meet this requirement as to each individual Plaintiff.[4]

3         The first named Plaintiffs in the CAC are the Sizemores.  Plaintiffs allege Defendants made

4  the alleged misrepresentations to the Sizemores "prior to agreeing to refinance their loan with

5  Countrywide," which loan they received on May 19, 2006.  (CAC at 14.)  Defendants assert these

6  allegations are insufficient because they do not specify the exact time and place of the

7  misrepresentations.  They are correct that the allegations are not sufficiently specific.  Although

8  specific dates are not always required to satisfy Rule 9(b), *see Continental Airlines, Inc. v. Mundo*

9  *Travel Corp.*, 412 F.Supp.2d 1059, 1068-69 (E.D. Cal. 2006) (stating allegations that

10  misrepresentations were made "between March and May 2005" satisfied Rule 9(b)), stating that the

11  misrepresentations occurred "prior to agreeing to refinance" the loan is not enough.  Rule 9(b)

12  demands greater specificity in the time and place of the misrepresentations, which Plaintiffs have

13  failed to allege.

14         The next named Plaintiff is Edward Marini.  Plaintiffs allege Defendants made the alleged

15  misrepresentation to Marini "[p]rior to agreeing to the loan refinancing[.]"  (CAC at 16.)  They also

16  allege the misrepresentation was made "via telephone" by "Countrywide customer service

17  representatives[.]"  (*Id.*)   Defendants assert these allegations are insufficient because they do not

18  specify exactly when the misrepresentations were made, nor by whom.  As with the Sizemores,

19  Plaintiffs fail to provide a specific and limited time frame in which Countrywide made the

20  misrepresentations to Marini.  Plaintiffs allege Marini obtained a subprime loan from a third party in

21  February 2005, and that "[w]ithin a few months," he was contacted by Countrywide.  (*Id.*)  However,

---

23  [4]    Defendants also argue Plaintiffs must demonstrate they relied on Defendants'
misrepresentations to establish causation.  In support of this argument, Defendants rely on *Bridge v.*

24  *Phoenix Bond & Indem. Co.*, ___ U.S. ___, 128 S.Ct. 2131 (2008).  However, the Court does not agree
with Defendants' interpretation of that case.  Contrary to Defendants' suggestion, the Court

25  specifically held "that a plaintiff asserting a RICO claim predicated on mail fraud need not show,
either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied

26  on the defendant's alleged misrepresentations." *Id.* at 2145.  Although the Court stated that, "[i]n most
cases, the plaintiff will not be able to establish even but-for causation if no one relied on the

27  misrepresentation[,]" it went on to state that proof of reliance "'does not transform reliance itself into
an element of the cause of action.'  Nor does it transform first-party reliance into an indispensable

28  requisite of proximate causation." *Id.* at 2144 (citation omitted).  Accordingly, the Court rejects
Defendants' assertion that Plaintiffs must plead reliance on Defendants' misrepresentation as part of
their RICO claim.

1  Plaintiffs fail to allege whether the representations were made within those few months or at some

2  time thereafter, nor do they allege a time frame in which Countrywide "continuously reiterated" those

3  misrepresentations.  Indeed, it is unclear when Marini actually refinanced his loan with Countrywide.

4  These allegations do not satisfy Rule 9(b)'s specificity requirements for time or place.

5         Plaintiffs allegations, however, do identify the specific Defendant involved in Marini's loan:

6  Countrywide Home Loans, Inc.  (*Id.* at 17.)  That entity should be able to identify the specific

7  individuals involved in the Marini transaction, which is sufficient under Rule 9(b).  *See Liu Ciro, Inc.*

8  *v. Ciro, Inc.*, 895 F.Supp. 1365, 1374 (D. Hawaii 1995) (quoting *Wool v. Tandem Computers, Inc.*,

9  818 F.2d 1433, 1439 (9th Cir. 1987)) (stating "the requirements of Rule 9(b) relax 'as to matters

10  peculiarly within the opposing party's knowledge.'")  *Cf.*, *Odom*, 486 F.3d at 555 (finding failure to

11  name the particular employees involved in a retail transaction does not violate Rule 9(b)).

12         The next Plaintiffs are the Menichettis.  As with the Sizemores, Plaintiffs allege the

13  Menichettis received a subprime loan from CW Bank, N.A. on a particular date, August 18, 2006.  (*Id.*

14  at 18.)  Plaintiffs also identify the individual who made the misrepresentations, Don Cutler at Mid

15  Atlantic Capital, but as Defendants point out, Plaintiffs fail to allege when these misrepresentations

16  were made.  Plaintiffs must set forth more specific allegations at to the time and place to satisfy Rule

17  9(b).

18         The same may be said of the allegations concerning Plaintiffs Sequesta Washington, June

19  Harding Brown, Preston Givens and Paula Prezola, and Kimberly A. Jackson.  Plaintiffs allege that

20  Washington received her loan on November 20, 2004, but they allege the misrepresentations were

21  made "at the time she was offered the loan[.]"  (*Id.* at 20.)  There are no specific allegations as to that

22  time frame.  As to Plaintiff Brown, Plaintiffs allege she obtained a loan from Countrywide "on or

23  about August 17, 2007," (*id.* at 23), but there are no specific allegations as to when the representations

24  were made.  (*Id.*)  It appears the representations were made at some point "prior to closing," but that

25  general allegation does not satisfy Rule 9(b).  A similar set of facts is alleged as to Givens and Prezola,

26  *i.e.*, Plaintiffs allege when Givens and Prezola obtained the loan, but they fail to allege any specific

27

28

1    or limited time frame in which the misrepresentations were made.[5]  Plaintiffs do allege a time frame

2    in which misrepresentations were made to Jackson, but that time frame, from January 9, 2004, to

3    September 28, 2005, is not specific enough.  Nor do Plaintiffs specify which Defendant made the

4    misrepresentations to Jackson, or the specific content of those misrepresentations.  Thus, these

5    allegations are subject to dismissal for failure to satisfy Rule 9(b).

6         In contrast to the Plaintiffs discussed above, Plaintiffs have satisfied Rule 9(b) as to the Leyvas

7    Plaintiffs.  Although Defendants complain that Plaintiffs have failed to specify when or where the

8    misrepresentations were made, or who made them, the allegations are specific enough.  Plaintiffs state

9    the Leyvases "began looking to refinance their then-existing mortgage" "[i]n July of 2007," and that

10   they obtained a home loan from Countrywide "on or about August 31, 2007."  (*Id.* at 21.)  This

11   specific and limited time frame satisfies Rule 9(b).  *See Continental Airlines*, 412 F.Supp.2d at 1068-

12   69.  Furthermore, as explained above, Plaintiffs' identification of the broker entity, Equity Capital

13   Group, Inc., (CAC at 21), is sufficient.

14        In sum, the majority of Plaintiffs' misrepresentation allegations fail to satisfy the particularity

15   requirements of Rule 9(b).  The only allegations that do satisfy Rule 9(b) are those pertaining to the

16   Leyvases, and Plaintiffs' identification of the specific Defendant involved in the Marini and

17   Givens/Prezola transactions.   With these exceptions, Plaintiffs' individual misrepresentation

18   allegations are subject to dismissal pursuant to Rule 9(b).

19                    *ii.*    *General Misrepresentations*

20        In addition to the individual misrepresentations made to particular Plaintiffs, Plaintiffs allege

21   Defendants have generally misrepresented that their loans are "the 'best available' to the borrower,

22   or 'ideal' for that borrower."  (CAC at 9.)  Plaintiffs allege Defendants made these misrepresentations

23   to three Plaintiffs in this case, Marini and the Menichettis.  Defendants argue these statements are

24   mere puffery, and therefore not actionable.  Plaintiffs disagree.

25        The Ninth Circuit has not decided whether statements that a product is "the best" or "ideal"

26   are non-actionable puffery.  However, the Sixth Circuit has confronted this issue, and agrees with

27   

28        [5] Defendants also complain that Plaintiffs fail to identify the individual broker involved in the Givens/Prezola transaction.  As explained above, the Court finds Plaintiffs' identification of the broker entity, Countrywide KB Home Loans, is sufficient.

Defendants.  *See City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) (finding statement that products were "the best" in world non-actionable puffery); *In re Ford Motor Co. Securities Litigation*, 381 F.3d 563, 570 (6th Cir. 2004) (finding "Ford has its best quality ever" non-actionable puffery).  That court reasoned that all public companies make these kinds of representations about their products or services, which ultimately renders the statements immaterial.  *Bridgestone*, 399 F.3d at 671; *In re Ford Motor Co.*, 381 F.3d at 570.  The widespread use of such statements also makes it difficult for plaintiffs to prove they relied on the statements in making their decisions.  *See Procter & Gamble Co. v. Kimberly-Clark Corp.*, 569 F.Supp.2d 796, 799 (E.D. Wis. 2008) (citing *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 160 (2d Cir. 2007)) ("When an advertiser claims his store that has the 'lowest' prices or his product is the 'best,' no one expects that consumes will take his claims at face-value: there is, for such claims, no reliance.")

Plaintiffs do not address this line of cases.  Instead, they attempt to recast Defendants' statements as asserting their products are "the best" for a particular individual as opposed to being generally "the best."  Although this distinction may be appropriate to the claims of Marini and the Menichettis, it still does not overcome the rationale of these decisions.  Whether made to the general public or specific individuals, the statements are too prevalent to constitute actionable misrepresentations.  *See Slane v. Emoto*, 582 F.Supp.2d 1067, 1085 (W.D. Wis. 2008) (quoting *State v. American TV & Appliance of Madison, Inc.*, 146 Wis. 2d 292, 301-02 (1988)) (finding "'[a] general statement that one's products are best is not actionable as a misrepresentation of fact.'"); *Hoyte v. Yum! Brands, Inc.*, 489 F.Supp.2d 24, 30 (D.D.C. 2007) ("KFC's claims that its restaurants serve the 'best food' is a non-measurable, 'bald statement of superiority' that is non-actionable puffery.")[6] Accordingly, while these representations may be alleged as relevant background facts, they may not form a basis of Plaintiffs' RICO fraud-based claims.

*iii.*     *Non-disclosures*

---

[6]  In light of this finding, the Court does not address Defendants' additional arguments regarding these allegations.  (*See* Mem. of P. & A. in Supp. of Mot. at 16-17.)

1    In addition to relying on the misrepresentations discussed above, Plaintiffs' RICO claim relies

2   on two types of alleged non-disclosures: Defendants' specific non-disclosures to the named Plaintiffs,

3   and Defendants' failure to disclose their alleged scheme to defraud.  Defendants dispute that they

4   failed to disclose any terms to the individual Plaintiffs, and assert they had no duty to disclose their

5   alleged fraudulent scheme, therefore these allegations should be dismissed.  Plaintiffs disagree.

6    In support of their first argument, Defendants provide copies of the loan documents referred

7   to in the CAC.  These documents support Defendants' assertion that they disclosed the relevant terms

8   to the named Plaintiffs.  However, Defendants fail to provide any binding authority that warrants

9   dismissal of Plaintiffs' allegations at this stage of the case.  Of the authorities cited, there is only one

10  case from the Ninth Circuit: An unpublished opinion from the Eastern District of California in which

11  the court granted summary judgment in favor of the defendant.  *See Stetler v. Greenpoint Mortgage*

12  *Funding Inc.*, No. 1:07cv0123 DLB, 2008 WL 192405 (E.D. Cal. Jan. 23, 2008).  Notably, the court

13  did not dismiss the plaintiff's claims at the pleading stage, nor did it find that the claims were legally

14  incognizable.  In addition, in *In re First Alliance Mortgage Co.*, 471 F.3d 977, 991-92 (9th Cir. 2006),

15  the Ninth Circuit reviewed a class action claim similar to the one raised here after the claim was

16  presented to and decided by a jury.  That such a claim would proceed to verdict and survive review

17  by the Ninth Circuit suggests Plaintiffs' claims ought to proceed, particularly at this stage of the

18  proceedings.

19   The same cannot be said, however, of Plaintiffs' allegation that Defendants failed to disclose

20  their overarching fraudulent scheme.  Although such allegations may state a claim under California

21  law, *see Warner Construction Corp. v. City of Los Angeles*, 2 Cal. 3d 285, 294 (1970), Ninth Circuit

22  case law holds they cannot serve as the basis for a federal claim of mail or wire fraud "[a]bsent an

23  independent duty, such as a fiduciary duty or an explicit statutory duty," *Cal. Architectural Building*

24  *Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1471-72 (9th Cir. 1987), none of which

25  is alleged here.  Accordingly, these allegations do not advance Plaintiffs' federal claim.[7]

26

27    [7] The findings on the individual and general misrepresentations and the failure to disclose
    specifics to the individual Plaintiffs apply with equal force to Plaintiffs' conspiracy claim, as well as
28  their state law claims for violations of California Business and Professions Code §§ 17200 and 17500.
    As indicated, however, the failure to disclose the general scheme may serve as the basis for Plaintiffs'
    §§ 17200 and 17500 claims.  Accordingly, the motion to dismiss those allegations from those claims

2.      Aiding and Abetting Violation of § 1962(c)

In addition to the substantive RICO claim, Plaintiffs allege a claim for aiding and abetting the violation of § 1962(c).  Defendants contend there is no private right of action for aiding and abetting a RICO violation, therefore this claim must be dismissed.  Plaintiffs disagree.

Title 18 U.S.C. § 1964(c) authorizes private rights of action for RICO violations.  It states:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

///

18 U.S.C. §1964(c).  Although the Ninth Circuit has not decided whether this statute allows for a private right of action for aiding and abetting a RICO violation, the Third Circuit has found there is no such right.  *See Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 657 (3d Cir. 1998) (citations omitted).  In reaching that decision, the court relied on *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), wherein the Supreme Court held there was no private right of action for aiding and abetting a violation of Section 10(b) of the Securities and Exchange Act.  The *Rolo* court found the *Central Bank* analysis "controls our construction of the civil RICO provision," and that "[l]ike § 10(b), the text of § 1962 itself contains no indication that Congress intended to impose private civil aiding and abetting liability under RICO."   155 F.3d at 657. Accordingly, the *Rolo* court upheld the district court's dismissal of the aiding and abetting claim.

Defendants urge this Court to adopt the reasoning and result of *Rolo*, and dismiss Plaintiffs' aiding and abetting claim.  Plaintiffs do not address *Rolo* or its reasoning, or explain why the Court should not adopt its holding.  They simply point out that district courts throughout the country have reached different conclusions on the issue, therefore their claim should not be dismissed.  (*See* Mem. of P. & A. in Opp'n to Mot. at 25.)  However, this Court finds the reasoning of *Rolo* persuasive.  It is consistent with the Supreme Court's approach to statutory construction, and its analysis of § 1964(c)

is denied.

1   is sound.  Accordingly, this Court adopts that reasoning to reach the same result: There is no private

2   right of action for aiding and abetting a RICO violation.  Plaintiffs' claim is, therefore, dismissed.

3   **C.      Section 17200 and 17500 Claims**

4            The Court now turns to Plaintiffs' state law claims.  The first two claims allege violations of

5   California's unfair competition law, Business and Professions Code § 17200, and its false advertising

6   law, Business and Professions Code § 17500.  In addition to the arguments raised above in connection

7   with Plaintiffs' RICO claim, Defendants assert they cannot be held liable under these statutes because

8   they did not commit the offending conduct.  Plaintiffs disagree.

9            In support of this argument, Defendants rely on *Perfect 10*.  In that case, the plaintiff sued

10  financial institutions involved in processing credit card payments to web sites that were alleged to

11  infringe the plaintiff's copyright, trademark and publicity rights.  494 F.3d at 793.  The plaintiff

12  alleged claims for "contributory and vicarious copyright and trademark infringement as well as

13  violations of California laws proscribing unfair competition and false advertising, violation of the

14  statutory and common law right of publicity, libel, and intentional interference with prospective

15  economic advantage." *Id.*  The district court dismissed the claims for unfair competition and false

16  advertising, and the Ninth Circuit affirmed.  In doing so, the court relied on *Emery v. Visa Int'l Service*

17  *Ass'n*, 95 Cal. App. 4th 952 (2002), wherein the court held that "[a] defendant's liability must be based

18  on his personal 'participation in the unlawful practices' and 'unbridled control' over the practices that

19  are found to violate sections 17200 or 17500." *Id.* at 960 (quoting *People v. Toomey*, 157 Cal. App.

20  3d 1, 15 (1984)).

21           Defendants here argue that the "unlawful practices," *i.e.*, the misrepresentations and non-

22  disclosures, were made by the individual brokers, therefore they cannot be held liable under the

23  statutes.  This argument, however, ignores the gist of Plaintiffs' claims.  Plaintiffs' claims do not rest

24  solely on the specific misrepresentations or non-disclosures allegedly made to the named Plaintiffs.

25  Rather, Plaintiffs allege that all of the Defendants were involved in a:

26           systematic scheme, encompassing Countrywide's entire lending process, to steer
             borrowers into the loans that were the most lucrative to Countrywide on the secondary
27           market by representing to borrowers that it was the best loan for the borrower, without
             having performed any appropriate analysis that would have indicated the unsuitability
28           of the loans for such borrowers.

1   (CAC at 14-15.)  These allegations are sufficient to sustain Plaintiffs' claims for unfair competition

2   and false advertising under California law.[8]  Accordingly, Defendants' motion to dismiss these claims

3   on this basis is denied.

4   **D.      Unjust Enrichment**

5          The next state law claim is for unjust enrichment.  Defendants argue this claim must be

6   dismissed for two reasons.  First, they assert a claim for unjust enrichment is not legally valid when

7   there is a contract between the parties.  Second, Defendants contend California law does not recognize

8   a claim for unjust enrichment.  Plaintiffs dispute both arguments.

9          In support of their first argument, Defendants rely on *Yang v. Dar Al-Handash Consultants*,

10  250 Fed. Appx. 771 (9th Cir. 2007).  In that case, the court found the plaintiff's unjust enrichment

11  claim failed as a matter of law because there was an express contract between the parties governing

12  the subject matter of the claim.  *Id.* at 773.  Specifically, the court found the plaintiff's unjust

13  enrichment claim "sought the same incentive payments governed by" the contract.  *Id.*

14         *Yang*, however, appears to be distinguishable from the facts of this case.  Although there are

15  contracts at issue in this case, none appears to provide for the specific recovery sought by Plaintiffs'

16  unjust enrichment claim.  This fact appears to be the basis for the *Yang* court's finding, and in the

17  absence of the same or similar facts here, that decision does not control this case.

18         Defendants' second argument is similarly unpersuasive.  Although the cases cited support

19  Defendants' argument, there is contrary case law.  *See Peterson v. Cellco Partnership*, 164 Cal. App.

20  4th 1583, 1593 (2008) (setting out elements of unjust enrichment claim); *Lectrodryer v. SeoulBank*,

21  77 Cal. App. 4th 723, 726 (2000) (same).  In light of this conflict, this Court declines to conclude that

22  this claim is legally incognizable.  Accordingly, Defendants' motion to dismiss this claim is denied.

23  **E.      Miscellaneous Arguments**

24

25

26         [8] These allegations also support keeping Defendants BAC, CFC and the LandSafe Defendants
    in this case.  Furthermore, Plaintiffs' have alleged facts to support their theory of successor liability
27  against BAC.  Plaintiffs allege BAC "acquired Countrywide on July 1, 2008[,]" (*id.* at 28), and the
    documents submitted in support of the motion confirm there was a merger.  (*See* Defs.' Request for
28  Judicial Notice in Supp. of Mot., Ex. B.)  Accordingly, Defendants' motion to dismiss these
    Defendants is denied.

1    In addition to the arguments raised above, Defendants argue that certain Plaintiffs should be
2    dismissed from this case, and that certain of the state law claims are preempted.  The Court addresses
3    these miscellaneous arguments below.

4         1.    <u>Plaintiffs Jackson, Marini and Philip Menichetti</u>

5    Defendants argue Plaintiff Jackson's claims should be dismissed from this case because they
6    fail to comply with Federal Rule of Civil Procedure 8.  Defendants also assert Plaintiffs Marini and
7    Philip Menichetti should be dismissed from this case for lack of standing

8         a.    <u>*Plaintiff Jackson*</u>

9    Federal Rule of Civil Procedure 8 requires that a claim for relief contain "a short and plain
10   statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).
11   Defendants argue Plaintiffs have failed to satisfy this standard as to Plaintiff Jackson, but the Court
12   disagrees.  Plaintiffs have alleged that Defendants' employees "targeted Jackson as a candidate for
13   refinancing" after monitoring her credit report and discovering an outstanding medical bill.  (CAC at
14   26.) They go on to allege that Countrywide made frequent calls to Jackson in which they made "false,
15   misleading and/or otherwise deceptive representations . . . encouraging her to refinance her mortgage
16   and receive cash to pay off her bills[.]"  (*Id.*)  According to Plaintiffs, Jackson did refinance with
17   Countrywide, but with a higher principal and interest rate than she had with her previous loan.  (*Id.*)
18   Plaintiffs allege Jackson would not have refinanced with Countrywide had she known that her
19   principal and interest rate would increase.  (*Id.*)  These allegations set forth "a short and plain
20   statement" of Jackson's claim.  Accordingly, Defendants' motion to dismiss her claims pursuant to
21   Rule 8 is denied.

22        b.    <u>*Plaintiffs Marini and Menichetti*</u>

23   Defendants' next argument is that Plaintiffs Marini and Philip Menichetti lack standing to
24   pursue their claims.  Defendants assert these Plaintiffs have recently filed voluntary petitions for
25   bankruptcy protection, thereby vesting these claims in their respective bankruptcy estates and
26   conferring standing on the bankruptcy trustees.  Plaintiffs do not dispute that these Plaintiffs filed
27   bankruptcy petitions, or that the trustees may be the proper party.  However, they request additional

28

1    time to determine whether these claims were abandoned, in which case Plaintiffs Marini and

2    Menichetti would have standing.

3         Based on the current record, the Court agrees with Defendants that neither Marini nor Philip

4    Menichetti has standing to pursue his claims in this case.  Therefore, they must be dismissed from this

5    action.  Dismissal of these Plaintiffs, however, is without prejudice.  In the case of abandonment,

6    Plaintiffs may reassert these claims on behalf of Marini or Philip Menichetti.  Plaintiffs may also

7    substitute the bankruptcy trustees as the real parties in interest.

8         2.    Preemption

9         Defendants' final two arguments are that the state law claims of Plaintiffs Leyvases and Brown

10   are preempted by the Home Owners' Loan Act ("HOLA"), and the state law claims of Plaintiffs

11   Menichettis are preempted by the National Bank Act ("NBA").  Plaintiffs dispute both of these

12   arguments.

13   / / /

14   / / /

15         a.    HOLA

16        Congress enacted HOLA "to charter savings associations under federal law, at a time when

17   record numbers of home loans were in default and a staggering number of state-chartered savings

18   associations were insolvent."  *Silvas v. E*Trade Mortgage Corp.*, 514 F.3d 1001, 1004 (9th Cir. 2008)

19   (citing *Bank of Am. v. City and County of San Francisco*, 309 F.3d 551, 559 (9th Cir. 2002)).  "Through

20   HOLA, Congress gave the Office of Thrift Supervision ('OTS') broad authority to issue regulations

21   governing thrifts."  *Id.* at 1005 (citing 12 U.S.C. § 1464).  "As the principal regulator for federal

22   savings associations, OTS promulgated a preemption regulation in 12 C.F.R. § 560.2."  *Id.* Subsection

23   (b) of that regulation "provide[s] a list of specific types of state laws that are preempted," and

24   subsection (c) lists the types of state laws that are not preempted.  *Id.* at 1005-06.

25        In *Silvas*, the Ninth Circuit set out a framework for analyzing preemption issues under this

26   regulation.  According to that framework, courts should first determine whether the state laws at issue

27   fall within subsection (b).  *Id.* at 1006.  If they do, the laws are preempted, and no further analysis is

28

1    necessary. *Id.* If the laws do not fall within subsection (b), courts must then consider whether the laws

2    fall within subsection (c).

3            Here, Defendants argue that the Leyvases' and Brown's state law claims fall within subsections

4    (b)(4) and/or (b)(9).  These subsections state that HOLA preempts:

5            state laws purporting to impose requirements regarding: ...

6            (4) The terms of credit, including amortization of loans and the deferral and
             capitalization of interest and adjustments to the interest rate, balance, payments due,
7            or term to maturity of the loan, including the circumstances under which a loan may
             be called due and payable upon the passage of time or a specified event external to the
8            loan; ... [and]

9            (9) Disclosure and advertising, including laws requiring specific statements,
             information, or other content to be included in credit application forms, credit
10           solicitations, billing statements, credit contracts, or other credit-related documents and
             laws requiring creditors to supply copies of credit reports to borrowers or applicants[.]

11

12   12 C.F.R. § 560.2(b)(4), (9).  Plaintiffs dispute that the Leyvases' and Brown's state law claims are

13   preempted by either of these sections.  They argue that the state laws at issue do not purport to impose

14   requirements regarding the terms of credit or disclosure or advertising activity.

15   / / /

16           The Court agrees with Plaintiffs that the Leyvases' and Brown's unjust enrichment claims are

17   not preempted by either section (b)(4) or (b)(9).  Those claims do not seek to impose requirements on

18   Defendants' conduct.  Rather, they simply seek the return of funds paid to Defendants pursuant to the

19   alleged scheme.

20           The Court also agrees with Plaintiffs that application of §§ 17200 and 17500 to the facts of this

21   case does not result in preemption under subsection (b)(4).  Contrary to Defendants' assertion,

22   Plaintiffs do not seek by virtue of these claims to impose requirements regarding the terms of credit

23   offered by Defendants.  Defendants are free to set their own credit terms.  Plaintiffs simply ask that

24   Defendants be fair and honest with the general public in their use of those terms.  Under these

25   circumstances, Plaintiffs' §§ 17200 and 17500 claims are not preempted by subsection (b)(4).

26           Subsection (b)(9), however, compels a different conclusion.  As stated above, that regulation

27   provides for preemption of state laws that seek to impose requirements regarding "disclosure and

28   advertising."  Plaintiffs assert their claims do not fall within this regulation because they do not seek

to impose "*specific disclosures* with respect to Defendants' loans or advertising." (Mem. of P. & A. in Opp'n to Mot. at 33.) Yet, the regulation is not limited to laws requiring "specific disclosures." It simply states "disclosure and advertising," and it goes on to include "laws requiring specific statements, information, or other content[.]" 12 C.F.R. § 560.2(b)(9). Although Plaintiffs concede their state law claims do not seek to impose specific disclosure requirements on Defendants, their claims do purport to impose requirements on Defendants' "disclosure and advertising." Therefore, the Leyvases' and Brown's §§ 17200 and 17500 claims are preempted.

<em>b.</em>    <u>NBA</u>

Unlike the Leyvases and Brown, who obtained loans from CW Bank, FSB, the Menichettis obtained their loan from CW Bank, N.A., a federally chartered bank. As a result, Defendants argue the Menichettis' state law claims are preempted by the NBA. The NBA regulations are similar to those under HOLA. Specifically, 12 C.F.R. § 34.4 provides:

> a national bank may make real estate loans under 12 U.S.C. 371 and § 34.3, without regard to state law limitations concerning: ...
>
> (4) The terms of credit, including schedule for repayment of principal and interest, amortization of loans, balance, payments due, minimum payments, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan; ... [and]
>
> (9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents.

12 C.F.R. § 34.4 (a)(4), (9).

In light of the similarity in the regulations, the Court adopts the reasoning set out above with respect to the Leyvases and Brown to reach the same conclusion on the Menichettis' state law claims. Pursuant to that reasoning, the Menichettis' unfair competition claim is not preempted. Their §§ 17200 and 17500 claims are not preempted under 12 C.F.R. § 34.4(a)(4), but they are preempted by § 34.4(a)(9).

<strong>III.</strong>

<strong>CONCLUSION</strong>

In light of the above, Defendants' motion to dismiss is granted in part and denied in part. Specifically,

- 25 -

(1) Defendants' motion to dismiss claim 1 is granted as to the individual misrepresentations made to Plaintiffs Sizemores, Marini, Brown, Washington, Menichettis and Jackson, and denied as to the individual misrepresentations made to Plaintiffs Leyvases. Defendants' motion to dismiss claim 1 as to individual misrepresentations made to Marini and Givens and Prezola is granted as to the allegations of time and place, but denied as to the allegations of identity. Plaintiffs are granted leave to amend their CAC to address these pleading deficiencies;

(2) Defendants' motion to dismiss claim 1 is granted as to the general misrepresentations that loans were "best" or "ideal." These allegations may remain in the CAC as background facts, but they cannot serve as the basis for Plaintiffs' claims;

(3) Defendants' motion to dismiss claim 1 is denied as to the specific non-disclosures relating to each Plaintiff;

(4) Defendants' motion to dismiss claim 1 is granted as to the alleged failure to disclose the general scheme. Plaintiffs are granted leave to amend their CAC to address these pleading deficiencies;

(5) Defendants' motion to dismiss claim 2 is granted to the same extent claim 1 is granted, and denied to the same extent claim 1 is denied;

(6) Defendants' motion to dismiss claim 3 is granted. Since there is no private right of action, this claim is dismissed with prejudice;

(7) Defendants' motion to dismiss claims 4 and 5 is granted as to the misrepresentation allegations to the same extent as claim 1. The motion to dismiss the non-disclosure allegations is denied. Furthermore, Plaintiffs Leyvases and Brown's claims 4 and 5 are preempted by the HOLA, and Plaintiffs Menichettis claims 4 and 5 are preempted by the NBA;

(8) Defendants' motion to dismiss claim 6 is denied;

(9) Defendants' motion to dismiss Plaintiffs Marini and Philip Menichetti for lack of standing is granted. Plaintiffs are granted leave to amend their CAC to address the standing deficiencies; and

(10) Defendants' motion to dismiss Defendants BAC, CFC and the LandSafe Defendants is denied.

1    Plaintiffs shall file their First Amended CAC on or before **March 6, 2009**.  If Plaintiffs' First

2    Amended CAC fails to address the pleading deficiencies outlined above or otherwise fails to state a

3    claim upon which relief can be granted, it will be dismissed with prejudice and without any further

4    leave to amend.  The parties shall report to Judge Papas' chambers for an Early Neutral Evaluation

5    Conference on **March 25, 2009**, at **9:00 a.m.**, at which time all pretrial and trial dates shall be set.

6    Judge Papas will issue a separate order outlining the procedures for that conference.

7        **IT IS SO ORDERED**.

8    DATED:  February 5, 2009

9    _____

10                       HON. DANA M. SABRAW
                         United States District Judge