1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| IN RE: COUNTRYWIDE FINANCIAL CORP. MORTGAGE MARKETING AND SALES PRACTICES LITIGATION | CASE NO. 08md1988 DMS (WMC) CASE NO. 08cv1888 DMS (WMC) CASE NO. 08cv1957 DMS (WMC) CASE NO. 08cv1972 DMS (WMC) |
| ─────────────────────────────── | |
| THIS DOCUMENT RELATES TO: | **ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| *White c. Countrywide Financial Corp.*, No. 08cv1972 DMS (WMC) | **[Docket Nos. 348, 360, 376, 377, 378, 381, 382, 384, 385]** |
| *Leyvas v. Bank of America Corp.*, No. 08cv1888 DMS (WMC) | |
| *Jackson v. Countrywide Financial Corp.*, No. 08cv1957 DMS (WMC) | |
| ─────────────────────────────── | |

20        This matter comes before the Court on Plaintiffs' motion for class certification.  Defendants

21 Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, FSB,

22 Countrywide Tax Services Corp., Countrywide KB Home Loans, LLC, LandSafe, Inc., LandSafe

23 Appraisal Services, Inc., LandSafe Flood Determination, Inc., and Bank of America Corporation[1] filed

24 an opposition to the motion, and Plaintiffs submitted a reply.  The parties also submitted supplemental

25 briefs at the Court's request.  Donna Siegel-Moffa, Alan Mansfield, Joe Whatley, Jr., Nicholas Roth

26 and Amanda Trask appeared and argued on behalf of Plaintiffs, and Thomas Hefferon, Brooks Brown

27 ────────────────────

28        [1]  Bank of America acquired Countrywide on July 1, 2008, and is named in this action as Countrywide's successor-in-interest.  (*See* First Amended Consolidated Class Action Complaint ¶ 105.)  Defendants are hereafter referred to as Countrywide or Defendants.

and Michael Sheldon appeared and argued on behalf of Defendants.  Having carefully considered the

pleadings and arguments of counsel, the Court now denies the motion.

**I.**

**BACKGROUND**

This case is part of a multi-district litigation concerning individuals and several business

entities involved in mortgage lending across the country.  Plaintiffs filed separate class action

complaints in other courts, and those complaints were transferred to this Court pursuant to an order

from the Judicial Panel on Multidistrict Litigation.  After transfer, several Plaintiffs joined together

and filed a Consolidated Class Action Complaint (CAC).  Following briefing and argument on

Countrywide's motion to dismiss, Plaintiffs filed a First Amended Consolidated Class Action

Complaint (FACAC).  The FACAC is the operative pleading for purposes of the present motion.

**A.      Class Allegations**

Plaintiffs allege that Countrywide engaged in a scheme to steer borrowers into "inherently

toxic and unaffordable" loans, which were then bundled and sold as investments on the secondary

market as "mortgage-backed securities."  (FACAC at 1-2.)  According to Plaintiffs, Countrywide

pushed borrowers into these loans irrespective of their ability to repay the loans or whether the loan

was appropriate for the particular borrower.  (*Id.*)  The sole criteria used by Countrywide for

approving a loan was profit-driven, that is, whether the loan could be sold on the secondary market.

"Since Countrywide never intended to keep these loans on its balance sheets, it did not care how risky

or unaffordable they were."  (Mem. of P. & A. in Supp. of Mot. at 9.)

Plaintiffs focus on two of Countrywide's loan products in this litigation: Pay Option

Adjustable Rate Mortgage loans (Pay Option loans or POAs), and Subprime loans.  Pay Option loans

provided borrowers with several monthly payment options: (1) a "minimum Payment," which was less

than the amount of interest owed on the loan, (2) an interest only payment, and (3) an interest payment

plus a portion of the principal of the loan as fully amortized over a 15, 30 or 40 year period.  (FACAC

¶ 5.) The minimum payment option resulted in negative amortization as the unpaid interest was added

to the principal.  Plaintiffs claim negative amortization made the loan inherently toxic because it

"unconscionably increased the debt burden and costs associated with the mortgage."  (Mem. of P. &

A. in Supp. of Mot. at 4.)  Plaintiffs cite an email dated August 19, 2006, from Anthony Mozilo, founder and CEO of Countrywide, in which he acknowledged that some 75% of Pay Option borrowers made only the minimum payment and thus were subjected to negative amortization and a resulting interest rate reset, (*id.* at 5); nevertheless, he noted the "fact of the matter is that the payoption product represents a very significant amount of profitability in both the bank and the mortgage bank because it is the only product left with margins."  (Decl. of Amanda R. Trask in Supp. of Mot. (Trask Decl.), Ex. P).  Because of these significant profits, Countrywide "continued to aggressively market POAs to consumers" despite the negative consequences to borrowers.  (Mem. of P. & A. in Supp. of Mot. at 5.)

The second loan product pushed by Countrywide, the Subprime loan, is claimed to be "inherently unaffordable" because the front-end debt-to-income ratio (debt service ratio for housing payment, including principal, interest, taxes, and insurance compared to gross monthly income) exceeded 31%, or the back-end debt-to-income ratio (total debt service ratio for total outstanding, recurring obligations including mortgage payments, credit cards, child support or alimony, and car payments compared to gross monthly income) exceeded 45%, either at the time the loan was originated or upon interest rate reset.  One of Plaintiffs' experts, Christopher Peterson, opined that the debt-to-income (DTI) ratios of 31% and 45%, respectively, are "hardstops" beyond which point a loan is "objectively unaffordable" for the borrower, and that any borrower whose loan falls outside those parameters has been injured *per se*.  "[D]ebt-to-income ratios *matter* because these ratios determine [a family's] ability to make ends meet on all of their other monthly expenses."  (Mem. of P. & A. in Supp. of Mot. at 6) (quoting Peterson Rebuttal Report ¶ 13.)  Plaintiffs contend that Countrywide nonetheless continued to aggressively market Subprime loans because it desired to be the "largest originator of loans in America, capturing 30-40% of America's mortgage market."  (*Id.* at 7); (Decl. of Donna Siegal Moffa in Supp. of Mot. (Moffa Decl.), Ex. 13 at CFC-SP0000147741) ("We believe market dominance really *is* our destiny.")

Given the aggressive top-down culture to sell loans, Countrywide "quintupled its subprime origination."  (Mem. of P. & A. in Supp. of Mot. at 8.)  As Plaintiffs' expert explains:

> Countrywide's status as a loan intermediary meant that it could profit even when borrowers did not repay their loans.  In Countrywide's originate-to-distribute business

1

strategy, the company profited by linking naive borrowers to unsuspecting investors, and cashing out before the two groups collapsed in on one another. In essence, Countrywide evolved into a predatory structured finance company.

2

3

(Mem. of P. & A. in Supp. of Mot. at 9) (quoting Peterson Report ¶ 64.)

4

Plaintiffs contend Countrywide accomplished its goal of selling vast quantities of toxic loans

5

through a number of means. First, it loosened its underwriting standards "beyond objectively

6

reasonable norms, to allow it to increase loan volume and capture market share." (Mem. of P. & A.

7

in Supp. of Mot. at 9.)[2] Countrywide freely funded loans to consumers who "could not afford them

8

based on any objectively reasonable criteria. These borrowers operated under the false belief that

9

'qualifying' for a Countrywide loan meant that they could afford it and that Countrywide had assessed

10

whether or not they could repay the loan and interest." (*Id.* at 9-10.)

11

Plaintiffs assert Countrywide's "Fast & Easy program" is emblematic of the sea change in

12

underwriting that occurred at that time, which allowed use of "'stated income' (*i.e.* no proof of

13

income) loans." (*Id.* at 10.) Plaintiffs further allege that when Countrywide found that its systems

14

were not approving enough loans, it simply rewrote the programming. Thus, Countrywide rewrote

15

its automated underwriting engine, Countrywide Loan Underwriting Expert System (CLUES), to

16

enable it to approve loans that previously would have been rejected. (*Id.*)

17

In addition, Plaintiffs claim Countrywide pushed these loans on borrowers through "uniform

18

sales pitches" by touting the loan products as great opportunities to cut monthly payments, while

19

concealing the true nature and potentially devastating consequences of the loans. (*Id.* at 10-11.)

20

"Countrywide emphasized that loan representatives should follow designated sales and marketing

21

scripts to the letter." (*Id.* at 12); (Moffa Decl., Ex. 30, at CFC-SP 0000257668) ("It is our belief that

22

a top sales organization is based on a scripted environment, consequently we require our sales force

23

to memorize the Sales Presentation ...."). Plaintiffs' expert, Dr. Botond Koszegi, opined:

24

/ / /

25

26

[2] Plaintiffs point out that the Securities and Exchange Commission (SEC) filed suit against Mozilo and other officials at Countrywide alleging they made material misrepresentations and omissions regarding the quality of Countrywide's mortgage lending business and thus defrauded its investors. The SEC alleged Countrywide "undertook an unprecedented loosening or expansion of its underwriting guidelines, to the point of virtually abandoning its guidelines by matching products offered by any competitor, writing riskier and riskier loans, and making exceptions to its already lax underwriting standards." (Mem. of P. & A. in Supp. of Mot. at 9 n.13) (quoting Trask Decl., Ex. D.)

27

28

the marketing strategies encouraged and supported by Countrywide and carried out in part by loan representatives made highly suboptimal decisions predictable and understandable by preying upon and exacerbating psychological tendencies in economic behavior that are conducive to less than perfectly optimal decision-making. In particular, Countrywide's conduct highlighted the possible benefits of its products while deliberately obfuscating the costs, leading borrowers to put too little weight on the costs.  Countrywide could easily have made modifications to its marketing to mitigate these psychological tendencies, but instead it made choices that exacerbated them.

(Mem. of P. & A. in Supp. of Mot. at 11); (Moffa Decl., Ex. 26) (quoting Koszegi Report at 6-7.)

Finally, Plaintiffs allege Countrywide incentivized "participating approved brokers and ... loan originators" through "performance expectations, compensation, bonus and reward programs." (Mem. of P. & A. in Supp. of Mot. at 18.)  Plaintiffs provide declarations from loan officers indicating they made more money by selling Pay Option loans and Subprime loans than by selling other types of loans.  Countrywide also ran contests to increase production of these loan products, and awarded vacation packages and money to top producers. (*Id.* at 20.)

Specifically, Plaintiffs allege in their FACAC that Countrywide executed the foregoing scheme through fraudulent means, including:

- incentivizing employees and brokers to place borrowers into subprime loans, (*id.* at 2-3),

- training and instructing employees to place borrowers into subprime loans without explaining the terms or disclosing the risks, (*id.*),

- "making false representations to borrowers, as set forth in standardized sales scripts, that they were offering the best loans available to the borrowers[,]" (*id.* at 4),

- using "an automated, computerized underwriting program that was designed to maximize the number of subprime loans[,]" (*id.* at 6),

- failing to adequately disclose future interest rate increases, (*id.* at 7),

- failing to disclose the risk of negative amortization, (*id.*),

- failing to disclose that underwriting standards had been "virtually abandoned," (*id.* at 5-6), and

- failing to disclose the overall scheme. (*Id.* at 1-3, 38.)

These allegations serve as the factual basis for the claims alleged in the FACAC, including: (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (2) conspiracy to violate RICO, 18 U.S.C. § 1962(d), (3) violation of California Business and

Professions Code § 17200 ("the UCL"), (4) violation of California Business and Professions Code § 17500 ("the FAL"), and (5) unjust enrichment.[3]

**B.      Countrywide's Response**

Countrywide asserts that in the years leading up to and including the putative class period, banks and other mortgage lenders faced increased demand from public policy makers to expand their offerings of residential mortgage loans. (Opp'n to Mot. at 5.)   Congress and bank regulators encouraged industry innovations, including making adjustable rate mortgages (ARMs) and encouraging lenders to increase lending to under-served communities. (*Id.*)  Among the products that first became popular in the years leading up to, and during, the class period were Pay Option loans and Subprime loans. (*Id.*)

Countrywide point outs the Pay Option loan was a type of prime loan that was made to borrowers with strong credit characteristics and was popular for a number of legitimate reasons.  The Pay Option loan "met the needs of borrowers buying property for investment and anticipating a rise in its price, borrowers with limited present income who anticipated substantially greater income in the near future, and borrowers with variable monthly incomes (for example, from commissions)."  (*Id.* at 6.)  The loans also were attractive to borrowers who desired to divert money to other investments. (*Id.*)

Subprime loans included loans with fixed interest rates and adjustable rates that reset as early as six months or as late as five years later.  These loans were referred to as "subprime" because of the credit characteristics of the borrowers, who typically had "weakened credit histories."  Subprime borrowers generally did not qualify for Pay Option loans.  Defendants contend there are many kinds of borrowers for whom such loans were beneficial, even when the loans exceeded the debt-to-income ratios complained about in this litigation.  Defendants claim, for example, that such loans were desirable for:

---

[3] Countrywide previously moved to dismiss the claims in the CAC, which the Court granted in part and denied in part.  Plaintiffs thereafter filed their FACAC, wherein they realleged the claims in the CAC, except for dropping a claim of aiding and abetting the RICO violation.  Defendants moved for partial dismissal and to strike certain of the claims alleged in the FACAC, which the Court granted in part and denied in part (ultimately leaving claims for RICO violation, conspiracy to violate RICO, California UCL claims under §§ 17200 and 17500, and unjust enrichment).

1    a borrower who has incurred other debts and reasonably will use cash back from the loan
2    to repay those more expensive debts, for a borrower who values spending a relatively
     greater portion of his or her income on housing to live in a better school district for her
3    children, and for a borrower who expects her income to rise substantially in the
     foreseeable future.

4    (*Id*. at 7.)

5         Countrywide further contends that during the loan origination process at issue, the potential

6    borrower selected a loan product by working with a Countrywide loan officer or with an independent

7    mortgage broker.   Loan officers and brokers, according to Countrywide, often had multiple

8    discussions with borrowers as the borrower considered the various loan options available to them and

9    the loan products that best fit their needs.

10        Countrywide emphasizes that it made loans through four separate divisions, each of which

11   executed the origination process in a different manner.  (*Id.* at 8.)  Two of Countrywide's divisions

12   made loans through independent brokers.  The Wholesale Lending Division (WLD) made prime loans,

13   including Pay Option loans, and its Specialty Lending Group (SLG) made subprime loans.

14   Countrywide asserts it had relationships with approximately 30,000 independent mortgage brokers

15   nationwide, and funded at least 248,791 loans to the class members through these brokers.

16   Countrywide further notes it had no ability to control how these brokers advertised loans or explained

17   loan terms to the borrower, and it did not provide any scripts for these brokers to use with prospective

18   borrowers.  (*Id*. at 8-9.)

19        Two other divisions, the Consumer Markets Division (CMD) and Full Spectrum Lending

20   (FSL), made loans through loan officers employed by Countrywide.  CMD originated only prime

21   loans, like POAs, and most of these loans were made through Countrywide branch offices located in

22   local communities.  The sales and marketing conducted by CMD loan officers "were the personalized

23   efforts of each individual loan consultant reaching out to her own contacts in the community – former

24   borrowers, realtors, and builders." (*Id.* at 9.)  According to Countrywide, "CMD loan officers did not

25   have any 'script' or set of standard oral communications that they were instructed to follow for their

26   communications with prospective borrowers." (*Id.*)  The FSL division primarily made subprime loans

27   by telephone solicitation, through a loan officer "who generally used a script to establish a dialogue

28   with the potential borrower." (*Id.*)  Countrywide claims the script was used only during initial calls,

1   and thereafter, the conversation with prospective borrowers varied based on borrower need and

2   preference.  (*Id.*)

3   **C.      Plaintiffs' Proposed Class: The POA Sub-Class and DTI Parameter Sub-Class**

4            Plaintiffs now move to certify a class consisting of borrowers who received a Pay Option loan

5   and borrowers who received a Subprime loan for which the debt-to-income ratio exceeded certain

6   ratios, as follows:

7               All individuals located in the United States who, between September 19, 2003
            and July 1, 2008, either:
8
9               (1) received a PayOption ARM or Payment Advantage loan from Countrywide
            Bank, FSB, Countrywide Home Loans, Inc., and/or Countrywide KB Home Loans,
            LLC and made at least one monthly "minimum payment" on such loan (the "POA Sub-
10          Class");[4] or

11              (2) received a mortgage loan from Countrywide Bank, FSB, Countrywide
            Home Loans, Inc. and/or Countrywide KB Home loans, LLC identified by
12          Countrywide as a subprime loan product, listed in Appendix A to this Memorandum
            of Law, for which their Front End Debt-to-Income Ratio (debt service ratio for housing
13          payment, including principal, interest, taxes, and insurance compared to gross monthly
            income) ("front end DTI") exceeded 31%, or their Back-End Debt-to-Income Ratio
14          (total debt service ratio for total outstanding recurring obligations including mortgage
            payments, credit cards, child support or alimony, and car payments to compared to
15          gross monthly income) ("back end DTI") exceeded 45%, either at the time the loan
            was originated or upon interest rate reset (the "DTI Parameter Sub-Class").
16
17  Plaintiffs assert the proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a)

18  and 23(b)(3).  Defendants dispute that this class satisfies the commonality, typicality and adequacy

19  elements of Rule 23(a) and the requirements of Rule 23(b)(3).

20                                              **II.**

21                                        **DISCUSSION**

22  **A.      Legal Standard**

23            "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf

24  of the individual named parties only.'"  *Wal-Mart Stores, Inc.* v. *Dukes*, ___U.S.___, 131 S.Ct. 2541,

25  2550 (2011) (citing *Califano* v. *Yamasaki,* 442 U.S. 682, 700-01 (1979)).  To qualify for the exception

26  to individual litigation, the party seeking class certification must provide facts sufficient to satisfy the

27  _____

28            [4] While Pay Option loans are a type of prime loan, Plaintiffs have referred to both Pay Option
    and Subprime loans as "subprime loans" in their FACAC and throughout their briefing.

                                              - 8 -

requirements of Federal Rules of Civil Procedure 23(a) and (b).  *Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304, 1308-09 (9th Cir. 1977).

Federal Rule of Civil Procedure 23(a) sets out four requirements for class certification – numerosity, commonality, typicality, and adequacy of representation.[5]  A showing that these requirements are met, however, does not warrant class certification.  Plaintiffs also must show that one of the requirements of Rule 23(b) is met.  Here, Plaintiffs rely on Rule 23(b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

The district court must conduct a rigorous analysis to determine whether the prerequisites of Rule 23 have been met. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982).  It is a well-recognized precept that "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"  *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 (1978) (quoting *Mercantile Nat'l Bank v. Langdeau,* 371 U.S. 555, 558 (1963)).  However, "[a]lthough some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on the merits at the class certification stage."  *Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 480 (9th Cir. 1983) (citation omitted).  Rather, the court's review of the merits should be limited to those aspects relevant to making the certification decision on an informed basis.  *See* Fed. R. Civ. P. 23 advisory committee notes. If a court is not fully satisfied that the requirements of Rules 23(a) and (b) have been met, certification should be refused. *Falcon,* 457 U.S. at 161.

**B.     Rule 23(a)**

Rule 23(a), and its prerequisites for class certification – numerosity, commonality, typicality, and adequacy of representation – are addressed in turn.

---

[5]  Fed. R. Civ. P. 23(a) provides: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

1.   Numerosity

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *Staton v. Boeing Co.,* 327 F.3d 938, 953 (9th Cir. 2003). The plaintiff need not state the exact number of potential class members; nor is a specific minimum number required. *Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, 448 (N.D. Cal. 1994). Rather, whether joinder is impracticable depends on the facts and circumstances of each case. *ld.* Here, Plaintiffs state, and Defendants do not dispute, that there are approximately 518,237 potential class members. A class of this magnitude satisfies the first requirement of Rule 23(a).

2.   Commonality

The second element of Rule 23(a) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement is met through the existence of a "common contention" that is of "such a nature that it is capable of classwide resolution[.]" *Dukes,* 131 S.Ct. at 2551. As summarized by the Supreme Court:

> What matters to class certification ... is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of commons answers.

*ld.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L. Rev. 97, 132 (2009)).

In this case, Plaintiffs list a number of legal and factual issues that they assert are common to the class. (*See* Mem. of P. & A. in Supp. of Mot. at 25-26.) Many of these issues go to the core of Plaintiffs' case, which is that Countrywide was engaged in a *scheme* to steer as many borrowers as possible into Pay Option and Subprime loans regardless of their suitability or affordability to the borrower. Countrywide disputes the existence of the scheme, but it is apparent the alleged scheme raises issues common to the class. Nevertheless, as discussed in more detail below, neither proof of the scheme nor proof of other elements of Plaintiffs' RICO, UCL and unjust enrichment claims is susceptible to class-wide resolution based on common evidence, as dissimilarities in the proposed class exist, and the dissimilarities are of such a nature that they "impede the generation of common answers apt to drive the resolution of the litigation." *Dukes,* 131 S.Ct. at 2551. Thus, Plaintiffs have

1   failed to establish commonality under Rule 23(a).

2          3.   Typicality

3          The next requirement of Rule 23(a) is typicality, which focuses on the relationship of facts and

4   issues between the class and its representatives.  "[R]epresentative claims are 'typical' if they are

5   reasonably co-extensive with those of absent class members; they need not be substantially identical."

6   *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir. 1998).  "The test of typicality is whether

7   other members have the same or similar injury, whether the action is based on conduct which is not

8   unique to the named plaintiffs, and whether other class members have been injured by the same course

9   of conduct."  *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal

10  quotation marks omitted).

11         Here, Plaintiffs assert the facts and legal theories underlying their claims are typical of the

12  facts and legal theories underlying the claims of all members of the proposed class.  Specifically,

13  Plaintiffs contend Plaintiffs Sizemore and Brown are typical of the POA Sub-Class, and Plaintiffs

14  Symone Leyvas and John Leyvas, Givens, Prezola, Jackson and Washington are typical of the DTI

15  Parameter Sub-Class involving subprime loans.

16         Defendants do not dispute these Plaintiffs' claims are typical for purposes of the RICO claim;

17  however, Defendants do dispute whether certain of these Plaintiffs have claims that are typical of the

18  UCL claim.  Specifically, Defendants argue Plaintiffs Sizemore, Jackson and Washington cannot bring

19  claims under California's UCL because they do not reside in California, the property underlying their

20  claims is outside of California, and the transactions occurred outside of the state.  Defendants also

21  contend the UCL claims of Plaintiffs Brown and the Leyvases are preempted.  Finally, Defendants

22  assert Plaintiffs Givens and Prezola do not fit within the class definition.[6]

23         In response to Defendants' arguments, Plaintiffs concede Brown and the Leyvases cannot

24  represent the class on the UCL claim.  Plaintiffs do not concede Plaintiffs Sizemore, Jackson and

25  Washington cannot bring claims under the UCL.  Plaintiffs also do not agree that Plaintiffs Givens and

---

26

27         [6] Defendants also argue Jackson and Washington should not be allowed to serve as class representatives because Plaintiffs did not designate them as such in their interrogatory responses. Plaintiffs respond that they amended their interrogatory responses to include Washington and Jackson as class representatives.  Accordingly, the Court declines to exclude these Plaintiffs from serving as class representatives on the ground they were not identified in a proper and timely manner.

28

- 11 -

Prezola do not fall within the class definition.

Whether the Sizemores, and by extension, Jackson and Washington, may bring claims under the UCL is the subject of Defendants' pending motion for partial summary judgment. For the reasons set out in the order on that motion, the Court declines to find these Plaintiffs are atypical or inadequate representatives for purposes of the UCL claim.

With respect to Givens and Prezola, Defendants argue their claims are not typical because at the time of origination of their loan their DTI ratios fell outside the range identified in the class definition. Plaintiffs do not dispute this fact, (*see* Moffa Decl., Ex. 9) (Dep. of Charles D. Cowan, Ph.D. at 20), but assert the proposed class of subprime borrowers includes individuals whose loans either have (such as the loans of Givens and Prezola) or will in the future reset with DTI ratios as specified in the class definition. Because the proposed class would include such individuals, the Court rejects Defendants' argument that Givens' and Prezola's claims are atypical of the claims of absent class members.[7]

### 4.   Adequacy of Representation

The final requirement of Rule 23(a) is adequacy. Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is grounded in constitutional due process concerns; "absent class members must be afforded adequate representation before entry of judgment which binds them." *Hanlon,* 150 F.3d at 1020 (citing *Hansberry* v. *Lee,* 311 U.S. 32, 42-43 (1940)). In reviewing this issue, courts must resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with

---

[7]   Although not presenting a typicality problem, Plaintiffs' assertion that the proposed class includes individuals whose loans will reset in the future with DTI ratios within the range identified in the class definition raises other concerns. First, it renders the class definition imprecise. *See Berndt v. Cal. Dep't of Corrections*, No. C 03-3174 VRW, 2010 WL 2035325, at *2-3 (N.D. Cal. May 19, 2010) (stating class definition imprecise "because, among other things, potential future events are insufficiently defined."). This poses a problem for a Rule 23(b)(3) class, whose members are entitled to notice and an opportunity to opt-out, and whose claims may be barred by *res judicata* if they do not do so. *See Xavier v. Philip Morris USA Inc.*, ___ F.Supp.2d ___, 2011 WL 1464942, at *14 (N.D. Cal. Apr. 18, 2011) (stating failure to define ascertainable class poses problem of whether *res judicata* would apply to future actions). Second, it raises concerns about standing. *See Strong v. Arkansas Blue Cross and Blue Shield Inc.*, 87 F.R.D. 496, 508 (D. Ark. 1980) (stating future applicants and employees of defendant have not yet suffered "injury in fact," and thus their claims are not "ripe for judicial resolution."). *See also, infra*, Section II.,C.,1.,b., n.11.

other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.* (citing *Lerwill* v. *lnflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir. 1978)).   The named plaintiffs and their counsel must have sufficient "zeal and competence" to protect the interests of the rest of the class.  *Fendler* v. *Westgate-California Corp.,* 527 F.2d 1168, 1170 (9th Cir. 1975).

Plaintiffs have demonstrated the absence of any conflict between themselves and their counsel and the members of the proposed class.  Plaintiffs have also demonstrated that they and their counsel will vigorously prosecute the case on behalf of the class.  Defendants argue Plaintiffs are not adequate class representatives because they have failed to assert any claims for personal injury, and thus they are waiving those claims on behalf of all members of the proposed class; however, as Plaintiffs point out, claims for personal injury are not cognizable under RICO or the UCL.   Accordingly, this argument does not defeat Plaintiffs' showing that the adequacy requirement has been met.

## C.      Rule 23(b)

The next issue is whether Plaintiffs have shown that at least one of the requirements of Rule 23(b) is met. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614-15 (1997).  In this case, Plaintiffs assert they have met the requirements of Rule 23(b)(3).  Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon,* 150 F.3d at 1022 (internal quotations omitted).  Rule 23(b)(3), as discussed, calls for two separate inquiries: (1) do issues of fact or law common to the class "predominate" over issues unique to individual class members, and (2) is the proposed class action "superior" to other methods available for adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  In adding the requirements of predominance and superiority to the qualifications for class certification, "the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote ... uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem,* 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3) advisory committee notes).

A "central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'" *Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935,

944 (9th Cir. 2009) (quoting *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1189 (9th Cir. 2001)).  Thus, courts must determine whether common issues constitute such a significant aspect of the action that "there is a clear justification for handling the dispute on a representative rather than on an individual basis."  7A Charles Alan Wright, *et al., Federal Practice and Procedure* § 1778 (3d ed. 2005).  The predominance inquiry under Rule 23(b) is rigorous, *Amchem,* 521 U.S. at 624, as it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Id.* at 623.

### 1.     RICO Claim

The first claim for relief is that Countrywide committed a RICO violation.  To prevail on this claim, Plaintiffs must establish Countrywide engaged in "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (*en banc*) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  Plaintiffs also must establish they suffered (1) injury to their business or property, and (2) that Countrywide's RICO violation was a proximate cause of that injury.  *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008) (citations omitted).

#### a.     *Racketeering Activity*

The racketeering activity alleged in this case is mail and wire fraud as defined in 18 U.S.C. §§ 1341[8] and 1343.[9]  "To allege a violation of the mail fraud statute, plaintiff must show that (1)

---

[8] Section 1341 states: "Whoever, having devised or intending to device any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter of thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1341.

[9] Section 1343 provides: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writing, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or

defendant devised a scheme or artifice to defraud, (2) defendant used the mails in furtherance of the scheme; and (3) defendant did so with the specific intent to deceive or defraud." *Sun Savings and Loan Ass'n v. Dierdorff*, 825 F.2d 187, 195 (9th Cir. 1987) (citing *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1399-1400 (9th Cir. 1986)).

Here, Plaintiffs allege Countrywide devised a scheme "to steer borrowers into subprime mortgages and loans irrespective of whether (i) the borrower would have qualified for a 'prime loan' or (ii) the borrower was unable to meet the financial terms of the subprime mortgage." (FACAC ¶ 2.) The overarching goal of the scheme, according to Plaintiffs, was to place as many loans as possible – without regard to the borrower – so that the loans could be bundled and sold on the secondary securities market.  Plaintiffs allege Countrywide used the mails and wires in furtherance of this scheme by sending and receiving "promotional materials, applications, agreements, manuals, correspondence, progress reports, [and] loan application disclosures." (*Id.* ¶¶ 212-14.)

Plaintiffs assert this alleged scheme can be proven by common evidence.  Specifically, Plaintiffs rely on Countrywide's: (1) "false representations to borrowers, as set forth in standardized sales scripts, that they were offering the best loans available to the borrowers[,]" (*id.* ¶ 7); (2) use of "an automated, computerized underwriting program that was designed to maximize the number of subprime loans" issued to borrowers, (*id.* ¶ 13); (3) directions and inducement to "its authorized, contracted brokers to direct borrowers into subprime loans even when borrowers have been qualified for loans on far more favorable terms[,]" (*id.* ¶ 14); and (4) "standardized training of brokers and loan officers, ... as well as standardized omissions of crucial information necessary for borrowers to make informed financial choices[.]"  (*Id.* ¶ 106.)

As discussed below, there are numerous common issues and facts with respect to the racketeering element of Plaintiffs' RICO claim; however, proving the fraudulent conduct that comprises the alleged racketeering activity also involves significant individualized inquiries, and these inquiries are of such a nature and number that they predominate over the common issues.  The common and individual issues are addressed in turn.

/ / /

---

imprisoned not more than 20 years, or both." 18 U.S.C. § 1343.

*i. Common Racketeering Evidence*

As an initial matter, it is not disputed that a sales script was used by one division of Countrywide (at least for initial borrower contact) and that the computerized underwriting program – CLUES – was reprogrammed to relax underwriting guidelines, and ultimately used by all Countrywide divisions to generate an enormous volume of loans. These facts, common to the class, could be used as proof of the alleged RICO scheme.

Plaintiffs also have come forward with evidence that Countrywide underwriters – apart from CLUES – employed relaxed guidelines, and in some cases ignored the guidelines, to meet Countrywide's goal of market dominance. Countrywide does not seriously dispute that charge. Rosie Hummel, a former senior underwriter for Countrywide, testified: "[T]he culture was to get as many loans done as quickly as possible and to get them closed." (Trask Decl., Ex. B) (Hummel Dep. at 27:25-28:2.) "The bar kept changing, as it were. And it was your responsibility to make the loan work regardless of whether or not it fit into the guideline." (Hummel Dep. at 7:8-14). Glenda Storm, a Countrywide underwriter in 2006, stated "approximately 95% of the people who received pay option arms should not have received them." (Storm Decl. ¶¶ 10-11.) She further stated, "Quite often, if I, as an underwriter, turned down a loan, the loan officer would go over my head, request an exception and receive it. ... [E]xceptions were granted nine out of ten times." (*Id.* ¶17-19.) This evidence is consistent with evidence that the conduct of underwriters and sales personnel was driven by the top-down culture to produce "and make as many loans as possible." (Trask Decl., Ex. C) (Parwani Dep. at 62:22-63:18). (*See, e.g.,* Trask Decl., Ex. K) (Countrywide Annual Report 2003 at 8) ("Aggressive market share growth has always been Countrywide's objective, and recent strategic endeavors enabled the Company's share of the origination market to nearly double over the last two years."); (Moffa Decl., Ex. 15, at CFC-SP 147541) (SLG division "will rank as a Top 5 Subprime wholesale lender with a ... [m]arket share growth of at least 15% annually ....") The foregoing evidence is common to the class and could be used by Plaintiffs to prove up the racketeering scheme.

Countrywide disputes Plaintiffs' assertion that it uniformly incentivized loan officers and brokers to make Pay Option and Subprime loans, (Opp'n to Mot. at 10-11), noting the central feature of compensation for employee loan officers in the CMD and FSL divisions "was loan volume, not

payment for particular kinds of loans." (*Id.* at 10.)  Countrywide also provides evidence that "CMD compensation plans did not incentivize Pay Option loans."  (*Id.*) (citing Graveline-Thomas deposition). But Plaintiffs have produced evidence tending to show that Countrywide, at least through its WLD and SLG divisions, did incentivize both POAs and Subprime loans.  Brian Robinett, managing director, chief credit officer and chief operations officer for the WLD division in 2007, stated:

> We had an SLG group focused on that [subprime] market.  We had the prime group [WLD] focused on that [prime] market.  *We were trying to incent the sales management team and wanted them to be aligned with our corporate goals of achieving higher market share in each market.  Compensation typically helps with that.*  So we wanted to ensure that as we drove these goals, the sales leaders in the field were aligned from a compensation perspective.

(Moffa Decl., Ex. 18) (Robinett Dep., at 20:3-9; 70:2-10.)  (*See also* Moffa Decl., Ex. 45 ("GOOD NEWS!!!!! ... AE [account executive] compensation will be enhanced as follows: ... AE's will be paid 10 basis points on all incremental SLG core volume rather than the first program period's 9 basis points.").  As noted, Countrywide's CEO, Mr. Mozilo, also favored the Pay Option loan due to its significant profitability.  Plaintiffs therefore have proffered evidence of sales incentives for POAs and Subprime loans by Countrywide's WLD and SLG divisions.  While that evidence does not establish a uniform practice among all divisions, it is common evidence that could be used by the class to establish the RICO scheme.

Countrywide also disputes there is common evidence of a uniform marketing strategy or training program for brokers and loan officers.  Plaintiffs, on the other hand, argue there is abundant evidence that Countrywide developed and implemented a uniform training and marketing program "across all its divisions" that emphasized the benefits of POAs and Subprime loans and de-emphasized their costs.  (Reply Br. at 17) (collecting citations to various depositions, reports, and documents).  But Plaintiffs' citation to the record simply does not support the assertion that a uniform training and marketing program "across all divisions" existed.  At most, the record indicates that certain divisions for certain loan products used particular marketing and training techniques.  (*See, e.g.*, Moffa Decl., Ex. 27) (Mays Dep., at 275:7-12) (CMD division highlighted the "minimum payment as the feature

1   to be used to market the pay option ARMs").  That type of evidence is common to the class and could

2   be used by Plaintiffs to prove the RICO scheme.

3       However, common evidence is lacking on other key aspects of Countrywide's alleged

4   fraudulent conduct.  That evidence includes individual inquiries regarding alleged omissions and

5   misrepresentations to over half a million consumers.

6                        *ii.  Individualized Racketeering Inquiries*

7       Plaintiffs assert class certification is appropriate because the RICO scheme centers on

8   Countrywide's systemic fraudulent omissions.   Specifically, Plaintiffs claim the overarching

9   fraudulent scheme stems from Countrywide's failure to disclose the abandonment of underwriting

10  standards to maximize the sale of loans on the secondary securities market, regardless of loan

11  suitability.  Countrywide disputes the allegation as a factual matter but, in any event, argues that –

12  standing alone, without additional evidence – no duty to disclose exists because there is no fiduciary

13  relationship between the parties.  *See Davidson v. Countrywide Home Loans, Inc.*, No. 09-cv-2694-

14  IEG (JMA), 2011 WL 1157569, at *5 (S.D. Cal. Mar. 29, 2011) ("[T]he allegation that Davidson

15  obtained a loan from Defendants that she could not afford, or that Defendants concealed the fact that

16  Plaintiff was not qualified for the loan, ... fails as a matter of law. ...  Defendants correctly argue the

17  alleged failure to disclose the purported securitization scheme cannot form the basis for Plaintiffs'

18  fraud in the inducement claim because a lender has no fiduciary duty to a borrower.").  *See also Cal.*

19  *Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987)

20  (alleged omissions cannot serve as the basis for a federal claim of mail or wire fraud "[a]bsent an

21  independent duty, such as a fiduciary duty or an explicit statutory duty.")  The Court agrees, as the

22  lender/borrower relationship here – on its face – does not create a fiduciary duty.

23      Countrywide further argues that to the extent Plaintiffs allege a duty to disclose arose from

24  "numerous misrepresentations and half-truths" by Countrywide to each of over a half million

25  borrowers that it was, among other things, undertaking an analysis of loan suitability to ensure the

26  borrower was "qualified" for a particular loan, (FACAC ¶¶ 219-222), it is entitled to show

27  individualized proof of loan suitability and the absence of misrepresentations and half-truths.

28  Countrywide proffers:

(a) many of the putative class members were borrowing for investment purposes (*E.g., Walters Decl.* ¶ 17; *Streicher Decl.* ¶ 11 (Exh. 7)); (b) many came to the loan officer with a specific product in mind and sought little or no advice (*E.g., Jones Decl.* ¶ 6); and (c) the several hundreds of thousands of borrowers whose loans were originated by brokers had no contact with Countrywide at all (other than receiving federally-mandated loan disclosures). (*Miller Decl.* ¶¶ 3-4; *Walters Decl.* ¶ 6).

(Opp'n to Mot. at 18.)

Determining whether a duty of disclosure arose based upon what was said between parties is necessarily fact intensive. Countrywide is entitled to explore what was said by whom, and when. Thus, even if under the circumstances a duty to disclose arose as to each class member (as alleged by Plaintiffs), proving it is rife with factual inquiries. Individual inquiries therefore predominate over common ones on the issue of whether Countrywide engaged in a scheme through omission.

Plaintiffs next argue that Countrywide implemented its scheme through standardized misrepresentations, and any variances in individual misrepresentations would not defeat class certification, relying principally upon *In re First Alliance Mortgage Co.,* 471 F.3d 977 (9th Cir. 2006). There, the court upheld certification of a class where the evidence established a "centrally orchestrated scheme" of training loan officers through a script called the "Track" to misrepresent and obfuscate loan terms, such as points, fees, interest rate, and the true principal amount of the loan, to unsuspecting borrowers. *Id.* at 985. The court noted the scheme was designed to "mislead borrowers through a standardized protocol the sales agents were carefully trained to perform, ... not[ing] in particular the standardized training program for sales agents, which included a script that was required to be memorized and strict adherence to a specific method of hiding information and misleading borrowers." *Id.* at 991. Under such circumstances, where a "'centrally orchestrated strategy'" exists, the "'center of gravity of the fraud transcends the specific details of oral communications.'" *Id.* (quoting *In re American Continental Corp./Lincoln Savings & Loan Securities Litigation*, 140 F.R.D. 425, 430-31 (D.Ariz. 1992)).[10]

---

[10]  Plaintiffs also cite *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004) (affirming certification of nationwide RICO class against HMOs where HMOs allegedly conspired to defraud physicians of payments due for medical services through use of systemic "uniform activities," such as medical necessity requirements, actuarial guidelines, and automated claims systems with adjusted codes and reimbursement rates, all of which were "designed to deny, delay or decrease reimbursement or payment to physicians."); and *Negrete v. Allianz Life Ins. Co. of North Am.*, 238 F.R.D. 482, 491-92 (C.D. Cal. 2006) (certifying nationwide RICO class where defendant required sales force, including

1  / / /

2        Unlike *First Alliance* and other cases like it, Countrywide's alleged nationwide scheme is not

3  sufficiently supported by evidence of standardized or uniform fraudulent conduct.  Countrywide made

4  loans through four divisions, each of which worked with different borrower groups and made loans

5  through different means.  Two of the divisions – WLD and SLG – worked through *30,000 independent*

6  *brokers*, where Countrywide had *no contact* with the borrowers.  The independent brokers in these

7  divisions placed "at least 248,791 putative class loans," and used *no script*. (Opp'n to Mot. at 28-29.)

8  Countrywide has produced evidence that with respect to these divisions, conversations about loan

9  products, loan features, and choice of loan occurred between the borrower and the broker, not the

10  borrower and Countrywide.   (*Id.* at 8-9) (citing Miller Decl. ¶¶ 3-4); (Moffa Decl., Ex. 51)

11  (Countrywide Wholesale Broker Agreement, § 1.1(a)) ("Broker shall have and maintain the exclusive

12  ongoing contact with Loan applicants(s) [] from the time of application until closing.")

13        With respect to Countrywide's loan officers (as opposed to brokers), some worked in the direct

14  consumer division – CMD – where contact with borrowers was encouraged but "*without aid of any*

15  *script* or standard sales materials."  (Opp'n to Mot. at 29.)  Countrywide points out the CMD group

16  "created brochures, flyers, print advertisements, and sales boosters that were ordered by branches,

17  made available to loan officers, and used by loan officers *in their discretion*.  (*Id.* at 9-10) (citing

18  Alward Dep.)   Countrywide notes that CMD officers did not have scripts or standard oral

19  communications that they were instructed to follow for their communications with prospective

20  borrowers.  (*Id.* at 10) (citing Bianchi Decl. ¶5-6.) Collectively, the WLD and SLG divisions through

21  their independent brokers and the CMD division through its loan officers, made "nearly 300,000 loans

22  to members of the putative class." (*Id.* at 2.)

23        With respect to the fourth division, FSL, Countrywide admits its loan officers used a script,

24  but argues "nothing in that script told loan officers to misrepresent or hide loan terms."  (*Id.*)  FSL's

25  main contact with borrowers was by telephone, through a loan officer "who generally used a script

26  to establish a dialogue with the potential borrower. (*Id.* at 10) (citing Mays Dep.) Countrywide claims

27

28
_____

independent agents, to use "common, uniform written sales marketing materials" which failed to
disclose annuities were worth substantially less than plaintiffs paid).

the script was used only by telephone sales representatives and *only during initial calls*, and thereafter conversations with borrowers "could and did vary based on a borrower's needs and preferences." (*Id.*) (citing Nicholson Decl. ¶ 4) ("Although I used the script, it served more as a guideline than a document that I had to follow line-by-line, because each call was unique to the customer, based on her questions, and the purpose of the call.")  Countrywide also points out that the FSL division made "subprime loans almost exclusively and ... had no connection to at least 299,762 of the putative class loans." (*Id.* at 25) (citing McErlane and Chow Decls.)  Thus, while the FSL division was "based on a scripted environment," which required its sales force "to memorize the Sales Presentation," (Moffa Decl., Ex. 30 at CFC-SP 257668), Countrywide correctly observes that evidence does not establish a "uniform sales pitch" or "standardized marketing" affecting the entire sales force of all four divisions.

The prevalent use of independent brokers by Countrywide, coupled with the use of a script by only one of four divisions in a limited manner, distinguishes this case from *First Alliance* and others like it.  Plaintiffs have failed to demonstrate the alleged scheme was implemented through a common (or uniform) course of conduct likely to mislead the entire class.  Sales by independent brokers and the alleged representations and omissions made by them are not sufficiently tethered to common proof that derives from, for example, a "standardized training program" or a "script that was required to be memorized [with] strict adherence to a specific method of hiding information and misleading borrowers," *First Alliance*, 471 F.3d at 991, that applied across all divisions of Countrywide. Similarly, individual inquiries into the sales made by Countrywide's loan officers (as opposed to brokers) predominate as Plaintiffs have not established that a script or other mechanism designed to misrepresent and obfuscate was uniformly used by loan officers.   Indeed, only one of four Countrywide divisions used a script.

The record also contains evidence that Countrywide brokers and loan officers did disclose loan risks and if they failed to do so, it was noted by Countrywide.  For example, Plaintiffs reference an advertisement used by Countrywide brokers which Plaintiffs claim touts the virtues of a Pay Option loan without disclosing risks like negative amortization.  (Mem. of P. & A. in Supp. of Mot. at 13) (Moffa Decl., Ex. 31.)  Yet, the single page advertisement clearly discloses: "Minimum payment

option may results (sic) in negative amortization."  In other evidence cited by Plaintiffs, a high level representative of Countrywide inquired in an email exchange with colleagues whether "the broker properly explained the PayOption program to the borrower," as the borrower was "a first-time home buyer on fixed income (disability)."  (Moffa Decl., Ex. 34 at CFC-SP 167080.)  In another email exchange cited by Plaintiffs regarding public criticism about Pay Option loans and "noise in the market" regarding such loans, it is noted by a high level representative of WLD that "[w]hile we all know the loan is an excellent choice for an informed consumer, 3 year hard prepay's (sic) with maximum rebates as a result of ARM margins likely coupled with exceptions on super jumbo deals may be a recipe that is hard to explain."  (*Id*. at CFC-SP 519620.)

While this evidence is used by Plaintiffs to show Countrywide did not fully disclose the "true costs" of POAs and its executives disregarded the "fundamentally damaging nature of POA loans," (Mem. of P. & A. in Supp. of Mot. at 12-13), the evidence also reveals – at least in some circumstances – that negative amortization *was disclosed*, that brokers *should disclose* to prospective borrowers the "PayOption program" as that product could be "an excellent choice for an informed consumer," and that Countrywide did not know or control what brokers said to prospective borrowers. This evidence supports Countrywide's argument that significant individual issues exist regarding the nature and scope of representations made to borrowers by brokers and loan officers about loan terms, costs and suitability.

In sum, although there is common evidence to prove the existence of the RICO scheme, individual issues also abound and they predominate over the common ones.  Thus, Plaintiffs have failed to satisfy the predominance requirement on the element of racketeering activity.

### b.   *Causation*

The same may be said of the element of causation.[11]  The parties agree that Plaintiffs must

_____

[11] The Court requested supplemental briefing on *Webb v. Carter's,* Inc., 272 F.R.D. 489 (C.D. Cal. 2011), among other cases.  In *Webb*, the court held that all members of a proposed class must satisfy the constitutional standing requirements set out in Article III, including causation and injury. *Id*. at 498.  After the parties submitted their supplemental briefs, and after oral argument on this motion, the Ninth Circuit issued *Stearns v. Ticketmaster Corp.,* ___ F.3d ___, Nos. 08-56065, 09-56126, 10-55341, 2011 WL 3659354 (9th Cir. Aug. 22, 2011).  In that case, the court stated that Ninth Circuit law "keys on the representative party, not all of the class members, and has done so for years." *Id*. at *5.  Therefore, this Court's inquiry into causation and injury is limited to the representative parties.  Notably, however, the class in *Stearns* was defined to include only individuals who had

1  establish causation, but they disagree about the method of proof.  Specifically, the parties disagree

2  about whether causation requires a showing of actual reliance on Countrywide's alleged

3  misrepresentations and omissions, or whether causation may be established through other means.

4       Plaintiffs argue reliance is not required to show causation.  In support of this argument, they

5  cite *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), where the Supreme Court was

6  presented with the question of "whether a plaintiff asserting a RICO claim predicated on mail fraud

7  must plead and prove that it relied on the defendant's alleged misrepresentations."  *Id.* at 641-42.  The

8  Court answered that question in the negative, holding "that a plaintiff asserting a RICO claim

9  predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to

10  establishing proximate causation, that it relied on the defendant's alleged misrepresentations."  *Id.* at

11  661.  The Court noted, however, that "none of this is to say that a RICO plaintiff who alleges injury

12  'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the

13  defendant's misrepresentations[,]" *id.* at 658, but the Court made clear that a plaintiff need not prove

14  reliance as an element of a RICO claim.  *Id.* at 658-59.

15       Defendants acknowledge *Bridge* but assert that under the facts and theories of this case,

16  Plaintiffs' claims are in fact based on actual reliance – much like that of common law fraud – citing

17  FACAC ¶ 108 ("As a result of Defendants' fraudulent scheme, and in reliance on and as a result of

18  Defendants' fraudulent misrepresentations and omissions, Plaintiffs and other Class members have

19  been injured in a variety of ways.")  Plaintiffs argue Countrywide has unfairly isolated allegations of

20  the FACAC and ignored Plaintiffs' other theories of causation.  (*See* Mem. of P. & A. in Supp. of Mot.

21  at 38) (stating causation may be established through "common sense" or "logical" inference).  Thus,

22  the Court agrees with Plaintiffs that reliance is not required to prove causation.[12]

23  _____

24  suffered an injury under Article III, and the court so found.  *Id.*  This is consistent with *Dukes*, 131
   S.Ct. at 2561, where the Supreme Court noted that "[b]ecause the Rules Enabling Act forbids

25  interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,' ... a class cannot be
   certified" if it runs afoul of the Act.  Accordingly, if a class is defined to include members who have

26  not suffered an injury under Article III, it may violate the Act's proscription against enlarging
   substantive rights that otherwise would not exist in the absence of class litigation.  Because Plaintiffs'

27  motion is denied on other grounds, the Court declines to address this issue further.

28       [12]  To the extent Plaintiffs argue they are entitled to a presumption of reliance in this case
   because Defendants failed to disclose a material fact, the Court disagrees.  The presumption of
   reliance applies only in cases "based on omissions as opposed to affirmative misrepresentations."

1    Absent reliance, Plaintiffs still must prove that Countrywide's conduct was both the "but for"

2    and proximate cause of their injuries.  *Bridge*, 553 U.S. at 653-54.  Plaintiffs correctly observe that

3    causation can be established through an inference of reliance where the behavior of plaintiffs and the

4    members of the class cannot be explained in any way other than reliance upon the defendant's

5    conduct.  (*See* Mem. of P. & A. in Supp. of Mot. at 37-40.)  In *Peterson v. H & R Block Tax Services,*

6    *Inc.*, 174 F.R.D. 78, 84-85 (N.D. Ill. 1997), reliance was apparent because class members paid a

7    significant fee for a service for which they were not eligible.  *Id.* at 85.  In *Garner v. Healy*, 184

8    F.R.D. 598 (N.D. Ill. 1999), the court also used this approach where the plaintiffs "paid money for a

9    'wax,' but instead received a worthless 'non-wax product[.]'  *Id.* at 602.  Other courts have used this

10   approach where the plaintiffs purchased a product that was worth less than the price paid, *Negrete*,

11   238 F.R.D. at 491-92 (finding common sense inference that no rational class member would have

12   purchased annuities if adequate disclosure of facts had been made), or where the product offered no

13   benefit in relation to its cost.  *Kennedy v. Jackson National Life Ins. Co.*, No. C 07-0371 CW, 2010

14   WL 2524360, at *8 (N.D. Cal. June 23, 2010).  *See also Minter v. Wells Fargo Bank, N.A.*, 274 F.R.D.

15   525, 546 (D. Md. 2011) ("it is reasonable to infer that plaintiff class members would not have

16   transacted with Prosperity had they known Prosperity was not a legitimate lender, especially given that

17   the class members were using Prosperity to secure mortgages and agree to very substantial personal

18   liabilities."); *Robinson v. Fountainhead Title Group Corp.*, 257 F.R.D. 92, 95 (D. Md. 2009) (similar).

19   Plaintiffs argue the misrepresentations and omissions in this case are similar to those in the

20   cases cited above and thus, an inference of reliance is warranted.  Plaintiffs state:

21   Here, ... the 'common sense' or 'logical explanation' for so many borrowers' entering
     into the Subprime Loans at issue even though they were objectively inappropriate for

22   them (either because they received inherently toxic POA loans or because the
     borrowers' DTI parameters were outside an objective range of affordability) is that it

23   was directly caused by Countrywide's and its brokers' standardized marketing ploys
     of emphasizing the benefits of these loans while obfuscating the down-side and risks,

24   as well as their standardized material omission concealing that no objective
     underwriting analysis of their appropriateness to the particular borrower was being

25   conducted.

26

27

28
     *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 666 (9th Cir. 2004).  It does not apply to cases like this,
     which involve "mixed claims" of omissions and affirmative misrepresentations.  *Id.*

(Mem. of P. & A. in Supp. of Mot. at 38.)  However, as discussed below, these alleged representations and omissions are not susceptible to a sweeping, class-wide inference of reliance as there are reasonable explanations for members of the class taking on a POA or Subprime loan despite the risks associated with such loans.

As Countrywide points out, "the Federal Reserve recognize[d] that Pay Option Loans may be appropriate for borrowers in certain circumstances."  (Opp'n to Mot. at 23) (citing *Riddiough Report* ¶ 47a) ("23% of Pay Option borrowers were investors; payment deferral option economically benefits investors with intention to resell").  After Countrywide highlighted that fact, Plaintiffs elected in their reply brief to exclude "investors" from the class, *i.e.*, borrowers who made "purchases ... for investment purposes" as distinguished from the "consumer borrower [who] purchas[ed] a home for his or her own use," thus reducing the class by 92,763 borrowers.[13]  (Reply at 13 n. 10.)  But just as the class is filled with borrowers who entered into a Pay Option loan purely for investment purposes, it is filled with borrowers who entered into the loans in question for reasons other than Countrywide's alleged fraudulent conduct.

For example, Plaintiffs do not seriously dispute that the class contains "hybrid investors," perhaps in significant numbers.  This type of borrower purchased a home for his or her own use and, given the rising housing market at the time, would assess their options during the term of the loan and then elect either to stay in the home or to "flip" it and pursue other options with the profit, such as buying another home or making other investments.  Other borrowers in the class may have expected a pay raise, bonus or commission, and thus took on a mortgage larger than they otherwise would have because they could reasonably anticipate meeting the terms of the loan in the future.  Other borrowers, with sufficient income to meet their former loan, may have elected to re-finance to a POA or Subprime loan and pull out equity and pay off higher interest debt, or purchase a "big ticket" item such as a car, or make other investments.  Still others (with a Pay Option loan) may have elected to make the

---

[13] On September 12, 2011, the parties submitted additional information at the Court's request concerning the approximate number of class loans that fall within the "investment" category.  It is undisputed that 92,763 loans fall within this category: 83,977 such loans in the POA Sub-Class (63,859 "investor" and 20,118 "second/vacation home"), and 8,786 such loans in the DTI Parameter Sub-Class (6,686 investor and 2,100 second/vacation home).  The carve-out of these loans/borrowers leaves a proposed class of approximately 518,000 members.

1   minimum payment and direct extra money to other investments in the stock market or elsewhere.

2          The Ninth Circuit has held the common sense approach to causation does not apply where, as

3   here, there is more than one logical explanation for the plaintiff's participation in the transaction or

4   conduct at issue. *Poulos*, 379 F.3d at 667-68.  In *Poulos*, the underlying conduct was gambling, with

5   allegations that defendants induced people to play their video poker and electronic slot machines based

6   on a false perception that the machines were true games of chance.  The court stated there was no

7   single logical explanation for gambling – "it may be an addiction, a form of escape, a casual endeavor,

8   a hobby, a risk-taking money venture, or scores of other things."  *Id.* at 668.  The court reasoned that

9   some gamblers "may be unconcerned with the odds of winning, instead engaging in casual gambling

10  as entertainment or a social activity," whereas others may gamble based on assessed risk.  *Id.* at 665-

11  66.  Given the numerous possible motivations, the court rejected the plaintiffs' position that causation

12  could be inferred through class-wide circumstantial evidence.  *Id. See also Martinelli v. Petland, Inc.*,

13  No. CV-09-529-PHX-DGCI, 2010 WL 376921, at *3-4 (D.Ariz. Jan. 26, 2010) (declining to infer

14  reliance based on representation of puppy's health because "there is no single, common-sense reason

15  for a puppy purchase."); *Jordan v. Paul Financial, LLC*, No. C 07-04496 SI, 2009 WL 192888, at *5

16  n.7 (N.D. Cal. Jan. 27, 2009) (distinguishing *Peterson* – where class members were induced by

17  representations in standard documents to purchase tax refund services for which they were ineligible

18  – on grounds there was more than one logical explanation for plaintiff's decision to take mortgage).

19  Similarly, because there is no single, logical explanation for taking on Countrywide's Pay Option or

20  Subprime loan, the common sense or logical approach to causation does not apply.

21         In addition, Countrywide has come forward with evidence that many borrowers with

22  knowledge of essential loan terms nevertheless elected to proceed given the benefits of the loan

23  product under then-favorable market conditions.

24         Countrywide also had policies requiring that loan terms and costs be fully disclosed.
       *See, e.g.,* CFC-SP 48219-39, at 48226 ("I will make sure that all of the costs of the

25     loan are fully and timely disclosed to the borrower") (*SRS Decl.* Exh. 28).  And those
       policies were followed.  For example, loan officers describe how they "walked the

26     borrowers through their loans from start to finish and covered every aspect of the loan,
       from cost and appraisal fees to other fees," (*Strond Decl.* ¶ 9-10) (Exh. 14), and

27     explained in detail the pros and cons of the Pay Option Loan product, including
       negative amortization.  *Wooten Decl.* ¶ 5 (Exh. 4); *Walters Decl.* ¶¶ 13-15.

28

(Opp'n to Mot. at 26-27.)

This evidence demonstrates that at least some class members elected to proceed with the loans in question despite the risks complained about in this litigation.  Given this evidence, which corroborates Countrywide's assertion that the class is filled with a wide spectrum of borrowers who took out loans for a variety of reasons under a variety of circumstances, Plaintiffs have failed to demonstrate that common issues predominate on the element of causation and that reliance can be inferred as a matter of common sense through common evidence.  Plaintiffs have failed to demonstrate that class members would not have taken on the loans in question but for the alleged misrepresentations and omissions attributed to Countrywide.

<u>c.</u> <u>Injury</u>

Nor have Plaintiffs shown the predominance requirement is met on the element of RICO injury.  RICO requires as a threshold for standing an injury to 'business or property.'"  *Avalos v. Baca*, 596 F.3d 583, 592-93 (9th Cir. 2010) (quoting 18 U.S.C. § 1964(c)).  The Ninth Circuit "requires that a plaintiff asserting injury to properly allege 'concrete financial loss.'"  *Canyon County*, 519 F.3d at 975 (quoting *Oscar v. Univ. Student Coop Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (*en banc*)).  Here, Plaintiffs assert they have suffered RICO injury simply by virtue of the loans they received.  Specifically, Plaintiffs argue the Pay Option loans are "inherently noxious" because of negative amortization, (Mem. of P. & A. in Supp. of Mot. at 5), and the Subprime loans are objectively unaffordable because of the DTI ratios.  (*Id.* at 6.)

In support of this theory, Plaintiffs rely on the opinions of Christopher Peterson.  Mr. Peterson is a Professor and Associate Dean at the University of Utah, S.J. Quinney College of Law.  (Decl. of Matthew Sheldon in Supp. of Defs.' Mots. to Strike (Sheldon Decl.), Ex. 1 at 1.)  According to his report, he is an expert "in the history, business practices, tactics and motives of securitization of residential mortgage loans."  (*Id.* at 2.)  Mr. Peterson opines that Pay Options loans "were an especially toxic and destructive loan for borrowers and are inappropriate under almost every circumstance."  (*Id.* at 38.)  He also opines that a hard-stop back-end DTI of 45% "is an objectively reasonable limit beyond which loans become unreasonably unaffordable."  (Moffa Decl., Ex. 8 at 3.)

Defendants argue these opinions do not meet the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), therefore the Court should not consider them in deciding the present motion.[14]  Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  In short, "[a]n expert's testimony is admissible only if (1) the expert is qualified, (2) his opinion is reliable, and (3) if his testimony is relevant and will assist the trier of fact." *Wells Fargo Bank N.A. v. LaSalle Bank National Ass'n*, No. 2:08-CV-1448 JCM (RJJ), 2011 WL 743748, at *2 (D. Nev. Feb. 23, 2011) (citations omitted).  Defendants argue Mr. Peterson's opinion does not meet any of these requirements.

First, Defendants argue Mr. Peterson is not qualified to offer an opinion on the universal affordability or suitability of either Pay Option loans or Subprime loans.  On this issue, the Court agrees with Defendants.  Although Mr. Peterson is qualified to offer his opinion about whether these loans make for good public policy, he is not qualified to offer an opinion on whether these loans are affordable or suitable for the proposed class as a whole.  Indeed, Plaintiffs fail to cite, and the Court has been unable to find, any case in which an expert was offered, much less found to be qualified, to provide an opinion on affordability or suitability of a product to a class of persons.  Perhaps this is because affordability or suitability of a product cannot be determined on a class-wide basis.  Whatever the reason, and despite Mr. Peterson's qualifications on other topics, he is not qualified to offer an opinion on whether the loan products at issue were suitable or affordable to the class as a whole.

Even if Mr. Peterson was qualified to opine on this subject, Defendants argue his opinion is unreliable.  In determining whether expert testimony is reliable, the Supreme Court has set out several factors that courts may consider, including:

---

[14]  The parties each filed motions to strike and *Daubert* motions directed to the other parties' experts and/or evidence.  The only evidence necessary to the Court's resolution of the present motion is the testimony of Plaintiffs' expert, Christopher Peterson.  For the reasons that follow, the Court grants Defendants' motion to strike the Peterson reports.  The Court denies the other motions as moot.

(1) whether the scientific theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community.

*Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002) (citing *Daubert*, 509 U.S. at 593-94). Defendants argue these factors support their position that Mr. Peterson's opinions are unreliable.

On the first factor, it appears Mr. Peterson has not tested his opinions about the affordability and suitability of the loans at issue.[15] Indeed, it is unclear how those opinions could be tested with respect to a class of individuals, unless the individuals all presented the same financial circumstances. Thus, this factor weighs in favor of a finding of unreliability.

The same may be said for the second factor, namely, whether the opinion or method has been subject to peer review and publication. Although some of Mr. Peterson's theories underlying his opinion have been published in scholarly journals, (Sheldon Decl., Ex. 10 at 43), his ultimate opinions in this case have not been published or otherwise subjected to peer review. Accordingly, this factor weighs in favor of a finding of unreliability.

The other factor Defendants rely on is the fourth factor, namely whether the opinion is generally accepted in the relevant community. Here, Defendants point out that two of Plaintiffs' other experts disagree with Mr. Peterson's opinion about the affordability and suitability of the loans at issue in this case. Specifically, Plaintiffs' expert Ira Holt testified that he was "sure there are records out there of people that have debt to income over 31 percent and have been able to make the payments just as there are borrowers with less than 31 percent of debt to income that couldn't make the payments." (Sheldon Decl., Ex. 13 at 258-59.) Similarly, Plaintiffs' expert Dr. Botund Koszegi stated in his report that "the flexibility aspect of a PayOption ARM can be useful for a borrower who has fluctuating

---

[15] Although Mr. Peterson has not tested his opinions, Defendants have. (*See* Decl. of Kenneth Chow in Supp. of Opp'n to Mot.) Mr. Chow took a survey of subprime loans originated by Countrywide, with front-end DTI ratios greater than 31 and back-end DTI ratios greater than 45. (*Id.* at 2.) Of the 352,866 loans that fell within that range, 115,416 loans were either paid off with no default or were current with no default. (*Id.* at 3.) Plaintiffs are quick to point out that the absence of a default does not necessarily mean a borrower has not been injured, but the absence of a default certainly raises questions about Mr. Peterson's opinion that these loans are uniformly unaffordable.

incomes - such as a seasonal worker who is regularly employed only part of the year - who can make low payments in low-income months and high payments in high-income months." (Sheldon Decl., Ex. 4 at 31-32.) These varying opinions from Plaintiffs' own experts also weigh in favor of a finding of unreliability.

For these reasons, the Court finds that Mr. Peterson's opinions do not satisfy Federal Rule of Evidence 702 or *Daubert*. Accordingly, the Court grants Defendants' motion to strike those portions of Mr. Peterson's opinions, and declines to consider his opinions in deciding the present motion. Absent Mr. Peterson's opinions, Plaintiffs have failed to provide any evidence that common issues predominate on the element of RICO injury.

In sum, although common evidence is available to prove Countrywide's overarching scheme, Plaintiffs have not shown that common issues predominate on the underlying fraudulent conduct or the elements of RICO injury and causation. Accordingly, the Court denies Plaintiffs' motion to certify a class for the RICO claim.[16]

2.    UCL Claim[17]

Turning to the state law claims, Plaintiffs first allege Defendants violated California Business & Professions Code § 17200. This statute prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]" Cal. Bus. & Prof. Code § 17200. Plaintiffs allege Defendants' conduct was both unlawful and fraudulent. Because the unlawful conduct is based on the RICO violation discussed above, the Court declines to address that prong further. Instead, the Court focuses its discussion on Plaintiffs' allegation that Defendants engaged in fraudulent conduct.

The fraudulent "prong of the UCL is 'governed by the reasonable consumer test: a plaintiff may demonstrate a violation by 'show[ing] that [reasonable] members of the public are likely to be

---

[16] Because Plaintiffs have not satisfied the predominance requirement, the Court declines to address the superiority inquiry with respect to the RICO claim. In addition, for the reasons set out above, the Court finds Plaintiffs have failed to satisfy the predominance requirement on the element of injury on the UCL claim.

[17] Although Plaintiffs allege a separate claim for violation of the FAL, they do not discuss this claim separately from their UCL claim. Given that approach, the Court likewise declines to address the FAL claim separately from the UCL claim.

deceived.'" *Rubio v. Capital One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1817 (2011), (quoting *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)). "To achieve its goal of deterring unfair business practices ..., the [California] Legislature limited the scope of the remedies available under the UCL ... to injunctive relief and restitution." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) (quoting *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 332 (1998)).

/ / /

The fraudulent business practice prong of the UCL is "distinct from common law fraud. 'A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for injunctive relief' under the UCL." *Stearns*, 2011 WL 3659354, at * 4 (quoting *Tobacco II*, 46 Cal. 4th at 312). "'This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices.'" *Id.* For these reasons, "'relief under the UCL is available without individualized proof of deception, reliance and injury.'" *Id.* (quoting *Tobacco II*, 46 Cal. 4th at 320).

The court in *Stearns*, however, pointed out that the rigorous inquiry under Rule 23 still applies. The court stated that, "it might well be that there was no cohesion among the [class] members because they were exposed to quite disparate information from various representatives of the defendant." *Id.* (citing *Dukes*, 131 S.Ct. at 2554-57; *Kaldenback v. Mutual of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 849-50 (2009)). That is the case here.

*Kaldenback* is instructive. There, the plaintiff brought an action against Mutual of Omaha (Mutual) concerning the sale of a so-called "vanishing premium" life insurance policy, in which plaintiff was led to believe that after making four annual premium payments ($12,648 total), the cash reserves on his policy – earned through high rates of interest on the cash accumulation of his premium payments – would be sufficient to cover his life insurance until the maturity date of the policy. 178 Cal.App.4th at 835-36. Eight years after making his last premium payment, however, Kaldenback was notified by Mutual that his cash reserves were insufficient and if he did not start making premium

payments again his policy would lapse. *Id.* at 836.  Plaintiff alleged for himself and an behalf of putative class members that Mutual provided uniform sales materials and training methods to its agents that allowed them to mislead customers into believing that a low cost of actual insurance could be invested by Mutual with a sufficient return to cover future premium payments until maturity of the policy, when in fact (given higher costs of mortality and declining interest rates) the policy could not perform as represented. *Id.* Plaintiff alleged that Mutual did not advise its customers of these inherent risks. *Id.*

In affirming the trial court's denial of class certification under the UCL, the court in *Kaldenback* held:

> Although Kaldenback claimed Mutual's presentations relating to [the policies] were uniform, it utilized standardized training methods, materials, and scripts to which agents were required to adhere, the evidence showed the opposite.  Mutual's policies were sold by independent agents, and during the class period, they were not required to attend training or utilize any given sales materials.  Agents were not required to adhere to a scripted sales presentation. ...

> Thus, ... here the determination of what business practices were allegedly unfair turns on individual issues. ...[T]here was no showing of uniform conduct likely to mislead the entire class, and the viability of a UCL claim would turn on inquiry into the practices employed by any given independent agent – such as whether the agent involved in any given transaction took Mutual's training and read Mutual's manuals, used the training and materials in sales presentations, and what materials, disclosures, representations, and explanations were given to any given purchaser.

178 Cal. App. 4th at 849-50.

As in *Kaldenback*, the determination of what business practices were likely to deceive turns on individual issues.  Plaintiffs must show "uniform conduct likely to mislead the entire class" to satisfy the predominance requirement. *Id.* at 850.  While Plaintiffs have asserted Countrywide's sales presentations regarding Pay Option and Subprime loans were uniformly made to over a half million borrowers, using standardized training methods and scripts to which the sales force was required to adhere, the evidence does not support those allegations.  More than half of the loans in question (approximately 300,000) were made by three separate divisions of Countrywide which used no script; nearly 250,000 of these loans were placed by independent brokers in two distinct divisions, where Countrywide was not involved with the communications between brokers and borrowers; the script in evidence was used by only one division of Countrywide for initial communications with prospective

borrowers by telephone sales representatives for Subprime loans only; and Countrywide has come

forward with evidence that in particular loan transactions borrowers (a) were informed by brokers and

loan officers of loan terms and costs, and (b) understood loan terms and costs from prior experience

or other sources.

/ / /

/ / /

/ / /

Under these circumstances, individual inquiries predominate on the issue of whether

Countrywide's alleged fraudulent business practices were likely to deceive the entire class.[18]

Therefore, the Court denies Plaintiffs' motion to certify a class on the UCL claim.

3.      Unjust Enrichment Claim

The last claim is for unjust enrichment, an equitable claim based on the concept of restitution.

The elements of this claim in California are: (1) receipt of a benefit, and (2) the unjust retention of that

benefit at the expense of another. *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51 (1996).[19]  Plaintiffs argue

that because the elements of unjust enrichment focus on the defendant's conduct, as does California's

UCL, "the same common evidence will establish this claim for the whole class, and no individualized

inquiry is necessary." (Mem. of P. & A. in Supp. of Mot. at 46.)  For the reasons set out in the

discussion of Plaintiffs' UCL claim, the Court finds individual inquiries would predominate over any

common ones.  Plaintiffs' motion to certify a class on the unjust enrichment claim is therefore denied.

**III.**

**CONCLUSION**

---

[18]  In light of this finding, the Court declines to address Defendants' additional argument that choice of law issues defeat a finding of predominance.  The Court will address that issue in more detail in its order on Defendants' motion for partial summary judgment.  Plaintiffs' failure to satisfy the predominance requirement also obviates the need for the Court to address superiority as to the UCL claim.

[19]  Countrywide argues that "'the law of unjust enrichment varies too much from state to state to be amenable to national or even to multistate class treatment.'" (Opp'n to Mot. at 48) (quoting *In re Aqua Dots Prods. Liab. Litig.*, 270 F.R.D. 377, 386 (N.D. Ill. 2010)).  Because certification of this claim is denied on other grounds, the Court declines to address this argument.

1    Plaintiffs have attempted to certify a nationwide class of over 500,000 borrowers (pared down

2    from 610,000 by excluding 92,763 "investor" borrowers), involving two distinct loan products by four

3    different divisions of Countrywide, which used different marketing techniques and materials, and

4    different sales protocol and sales agents, including independent brokers – over 30,000 of them – who

5    made nearly 250,000 of the challenged loans, which resulted in the collective sale of over a half

6    million loans across the country with different terms, through different representations and disclosures,

7    to differently situated borrowers.  Some borrowers were pleased, others were ultimately disappointed

8    / / /

9    but understood the risks up-front, while still others felt victimized.  Individual inquiries abound under

10    these circumstances.  Plaintiffs' motion for class certification is therefore denied.

11    **IT IS SO ORDERED.**

12    DATED:  October 11, 2011

13    _____

14    HON. DANA M. SABRAW
      United States District Judge